1    contingent, even if it's contingent.

2          THE COURT:  I read Getty a little more

3    narrowly, and at least I read Getty to require  --

4    I read Getty, and I'll admit that I've not studied

5    it as thoroughly as I expect to prior to making a

6    decision here, but I read Getty to turn on the

7    fact that the indemnity issue was raised.  You're

8    reading it more broadly.

9          MR. ROBERSON:  Your Honor, I am

10   definitely reading it more broadly, and I think

11   when the Court studies Getty, studies the Tex.dot

12   case and studies the Team Promotion case, what I

13   think you're going to find is there they did not

14   raise indemnity, they raised other affirmative

15   counts.  But let's talk about that for a minute.

16         What I see here is that they raise

17   indemnity.

18         THE COURT: Oh, yeah, I understand.

19         MR. ROBERSON:  The compulsory

20   counterclaim issue I think is another reason why

21   relief should be denied here, but upon re-reading,

22   I would suggest to the Court, and I've read Getty

23   a half a dozen times and again before I came in

24   here today, Getty on first reading lead me to the

25   same conclusion that you apparently reached.  On

1   re-reading and re-reading, I think what it says

2   is, when you read it together with Ingersol-Rand

3   and these other cases, if you seek any affirmative

4   relief, you then put on the hat of a Plaintiff.

5   Res judicata doctrine says when you're a

6   Plaintiff, you bring all your causes of action if

7   they relate to the same subject matter, and if you

8   don't, you're barred by res judicata from bringing

9   them later.

10          THE COURT:   All right.

11          MR. ROBERSON:   All right, Your Honor, let

12   me turn to what I think is a very important part

13   of this, and that's the Indemnity Agreement

14   itself.

15          Let's assume that indemnity was not pled.

16   Obviously, we think it is.   That it need not have

17   been pled.   We think it should have been.   Does

18   this indemnity provision apply to their request

19   for indemnity, the entire Impact Group?

20          I submit to you the answer is no, that

21   under Texas Indemnity Law, an indemnity provision

22   does not apply between the indemnitee and the

23   indemnitor unless the agreement so states

24   expressly and unequivocally, no such language

25   exists in this Indemnity Agreement.

1          What we have on the Screen is a little

2     hard to read, the size of the font, is the entire

3     Indemnity Agreement.

4          What we've done is we've split the top

5     and the bottom part of the Agreement so it's

6     easier for old eyes to read, talking about my

7     eyes, not the Court's.

8          THE COURT:  Thank you.  Nice try,

9     Mr. Roberson.

10          MR. ROBERSON:  Your Honor, this is

11     accorded notes, and I'll point to it on the

12     Screen, the upper left-hand corner of the

13     Indemnity Agreement, Page 4, clearly part of the

14     Letter Agreement.  They're all one in the same

15     Agreement.

16          Let's look at the terms of the Indemnity

17     Agreement.  What does the Indemnity Agreement

18     cover?

19          It clearly covers against "any losses,

20     claims, damages, liabilities, joint or several

21     that arise"  --  I'm reading, obviously, the

22     highlighted language  --  "in connection with its

23     services arising out of its engagement hereunder."

24     It's obviously referring to the indemnity.

25          And then toward the bottom, the

1    limitation is:  "Provided, however, the company

2    will not be liable to the indemnified party

3    hereunder to the extent any damages are found in a

4    final nonappealable judgment by a court of

5    competent jurisdiction to have resulted from a

6    gross negligence, bad faith or willful misconduct

7    of the indemnified party seeking indemnification

8    hereunder."

9         If you stop right there and you didn't

10   read any further, you could make an argument, I

11   don't think a very good argument, but you could

12   make an argument that maybe this is broad enough

13   to cover an indemnity versus indemnitor,

14   indemnitor versus indemnitee claim.

15        Nowhere in here does it say it does that.

16   It's not expressed, it's not unequivocal, and

17   there are cases that we cite where it is expressed

18   unequivocal, so what we have to do is we have to

19   go to the four corners of the document.  Let's

20   look at the bottom half of the Indemnity

21   Agreement.

22        The bottom half of the Indemnity

23   Agreement there's several indicia that courts have

24   looked at to determine whether it covers a claim

25   by Indemnitee against an Indemnitor in its own

1    claim as opposed to a claim by a third party.

2          The first is receipt by the   --

3    immediately upon or promptly after receipt by the

4    indemnified party of notice of any claim

5    indemnified party has to notify the company.

6          That clearly contemplates a third party

7    making claim against the Indemnitee and the

8    Indemnitee then going and notifying the company.

9          All right.  The second indicia of a third

10   party Indemnity Agreement is that the company

11   Dorado has the right to assume the defense of such

12   claim.

13         Well, if this covered claims by Dorado

14   against Impact, you would have the nonsensical

15   result under this Indemnity Agreement of Dorado

16   assuming defense of its own claim.  Clearly not

17   what's contemplated by the Agreement.

18         This is talking  -- clearly implying a

19   claim by a third party against the indemnitee and

20   the indemnitee then turning to Dorado for a

21   defense, not the situation you're hearing today

22   which is when Dorado makes a claim against Impact,

23   Impact has to turn around and tender the defense

24   of that claim to Dorado.  It would be circular.

25         The third element is the cooperation with

1   the company and the company's counsel in defense

2   of such action.

3          Again, I think it's pretty nonsensical

4   because it would have the Plaintiff and Defendant

5   cooperating with each other in the defense of the

6   lawsuit.

7          Again, I think what this tells us is that

8   this is a third party type of Indemnity Agreement.

9          The last thing, and it's not part of this

10  is  --  and I think it's instructive  --  several

11  of the cases we cite when the Court's are trying

12  to figure out whether it applies to an indemnitor

13  versus and indemnitee claim or a indemnitee versus

14  indemnitor, they look to see whether or not one of

15  the indemnified actions is a breach of a covenant

16  of the Agreement itself.

17         So, if the indemnity says: "I, the

18  Indemnitor agree and indemnify you the Indemnitee

19  from any breach of covenants 2, 6, 12" and those

20  happen to be affirmative covenants of the

21  indemnitor, the Courts says that tells the Court

22  that it was the intent of the Indemnitor to

23  indemnify the Indemnity for the Indemnitor's

24  breach of those covenants.  We don't have any of

25  that here.

1    So, I think the five elements or the five

2    indications that I see from this Agreement are

3    that it does not apply to a claim by Dorado

4    against the Indemnity.

5    Now, what we have here, the Court has

6    obviously picked up on it, is the anomalous

7    situation where the Indemnitee has taken a

8    Judgment against the Indemnitor for breach of

9    contract, approximately $1.3 million and is taking

10   the position that it should be indemnified by the

11   Indemnitor from the Judgment it took against the

12   Indmenitor.

13   It's almost mind-numbing to think about

14   that, but I don't know how  --  indemnities run to

15   claims against the Indemnitee.  When the

16   Indemnitee took a Judgment against the Indemnitor,

17   that's not a claim against the Indemnitee.  I just

18   don't see any way you can read this Agreement to

19   say that.

20   In sum, I think this Indemnity provision

21   not cover the Impact Group's claim arising from

22   Dorado's Jugment against Impact Group, the

23   Impact's Judgment against Dorado, or any of the

24   attorneys' fees that are subsumed in the trial of

25   those various actions which I'm going to talk

1    about now.

2             Let me show you a  --  Your Honor,

3    Mr. Culp is reminding me that one of the

4    provisions of the Indemnity Agreement, and it's in

5    the first paragraph, is a limitation on the

6    ability of the Indemnitee to seek recovery if

7    there's been bad faith or willful misconduct.

8             You recall, I showed you the two counts

9    from the Jury Charge where the Jury found that

10   there was an intentional misappropriation of a

11   trade secret and with unclean hands.  I think that

12   -- they didn't use the term "bad faith" although,

13   I think we cited a Texas case that says unclean

14   hands is another way to define want of good faith,

15   so I think it is bad faith. For that reason as

16   well, I don't think this Agreement applies.

17            The last thing I would say, and it does

18   raise the issue of Mr. Schmidt's Affidavit.  We

19   provided an Affidavit for Mr. Schmidt who tells us

20   that the matters in Panola County and in the U.S.

21   Investigation here in the Northern District did

22   not involve services under this Agreement.  This

23   Agreement which had been terminated for some time

24   prior to those investigations dealt with  --

25            THE COURT:  I'm sorry, start this again

1   because I was looking at something else that I

2   want to ask you about, and I missed the predicate.

3         MR. ROBERSON:  Okay.  The predicate, Your

4   Honor, is in the middle of the Screen.

5         In order to recover, the Indemnitee's

6   claim has to be based on actions taken in

7   connection -- the claim has to be in connection

8   with its services or arising out of its engagement

9   hereunder.  "Hereunder" obviously is the Letter

10  Agreement.

11        THE COURT:  Right.

12        MR. ROBERSON:  Mr. Schmidt's Affidavit

13  which is attached to our Response says that what

14  the Letter Agreement provided for was investment

15  banking services.  The investment banking services

16  in this contract had ended prior to Panola County

17  investigation which the evidence shows began

18  sometime in October of 2007, that the Panola

19  County investigation dealt with the nonpayment of

20  some Mechanic's and Materialman's creditors which

21  I think this Court's already heard about in the

22  main case, and that the payment or nonpayment of

23  those parties deals with the accounting records of

24  the Debtor, and the parties seeking indemnity here

25  have no involvement or responsibility in the

```
1    bookkeeping accounting records.

2            And lastly, Mr. Schmidt  --

3            THE COURT:  So, why were they

4    participating in that investigation?

5            MR. ROBERSON:  I have a theory, Your

6    Honor, that I'll save until we complete discovery.

7    I don't know.  They were subject to subpoenas, I

8    don't know why they were subpoenaed.

9            THE COURT:  What's the status of that

10   investigation?

11           MR. ROBERSON:  The Panola County Grand

12   Jury is expired with no action.  The U.S. Grand

13   Jury, I don't know whether it's expired or not,

14   but the last contact with Dorado was well over a

15   year ago, year and a half, or year and three

16   months ago.

17           But, Your HOnor, for those reasons, it

18   doesn't arise out of services under this

19   Agreement.  The fact that this is a three-way

20   Indemnity Agreement, not a two-way, I don't think

21   the Indemnity Agreement applies.  Forget whether

22   it was pled, whether it should have been pled,

23   whether it was compulsory or not compulsory, if

24   they were walking in here fresh off the street

25   making this indemnity claim based on this
```

1    Indemnity Agreement, I don't think there's

2    indemnity provided for under this Indemnity

3    Agreement because it clearly contemplates a third-

4    party claim against the Impact Group to be brought

5    to the attention of Dorado for defense cooperation

6    and ultimate payment.

7        THE COURT:  Let me ask you a question

8    about the exclusion of willful misconduct, bad

9    faith, whatever else the third one was.

10       MR. ROBERSON:  Gross negligence.

11       THE COURT:  Thank you.  It's the Jury --

12   it's in your Summaries, Question Number 4 to the

13   Jury, the misappropriation of trade secret

14   question.

15       MR. ROBERSON:  Yes, Your Honor.

16       THE COURT:  Did you cite cases  --  I at

17   least missed them if you did  --  that say that

18   willful misconduct or that misappropriation of

19   trade secret is an intentional tort (sic) of

20   willful misconduct in Texas?  We found lots of

21   cases in lots of other jurisdiction where

22   misappropriation of a trade secret is an

23   intentional tort, but at least quickly in looking

24   at it, we did not find anything in Texas that

25   defined it as an intentional tort.

1           MR. ROBERSON:  Your Honor, I can't recall

2    whether we did or not.  If we didn't and the Court

3    wants briefing on that, obviously, we're happy to

4    provide it.

5           THE COURT:  Well, I take it you would

6    agree with me for there to be willfulness, it

7    would likely have to be an intentional tort if it

8    is misappropriation of a trade secret that you're

9    arguing is the basis for the exclusion of

10   indemnification, then at least with respect to the

11   willful misconduct piece, it would likely have

12   been an intentional tort?

13          MR. ROBERSON: I agree, Your Honor.  I

14   would also add, and you can see the definition of

15   trade secret misappropriation given to the Jury,

16   the third portion of it was "unauthorized use of

17   the trade secrets."  I don't think it's an

18   accidental misappropriation or an unintentional

19   misappropriation, it's an intentional unauthorized

20   act, so if the Court  --  and I'm happy to look

21   and see, we may have cited it, I just don't recall

22   it as I'm standing here.

23          THE COURT:  All right.  Second question

24   is, with respect to the second element, the trade

25   secret was acquired one of three ways: Through a

1   confidential relationship, under a contractual

2   obligation not to disclose it, or through improper

3   means.

4           Which one of those was applicable here,

5   or all?

6           MR. ROBERSON:  Your Honor, I don't know.

7   I mean, I'm just reading the Charge.  I don't know

8   that the Charge  --  the Charge essentially says,

9   "If you find one of the three, answer yes."  I

10  don't know whether they found it was a

11  confidential relationship, whether it was pursuant

12  to a contract, or through improper means.  I don't

13  know.

14          THE COURT:  Well, and the reason  --

15  yeah, and I can't tell either, and I'll explain

16  why it's important to me, or at least I'm thinking

17  it's important, tell me if you disagree.

18          When we go down to what a confidential

19  relationship is, I come back to it's possible that

20  this could be the bad faith the exclusion would

21  talk about, but I can't tell what the Jury

22  answered "yes" for, so I don't know whether the

23  exclusion necessarily  --  and nobody should take

24  anything I say here today too seriously.  I do not

25  have a decision in mind with respect to this

1  matter yet, so if I state my questions as

2  definitive statements, they aren't.  They're

3  intended to show that I at least spent time

4  thinking about this and have questions.

5          But it defines "confidential

6  relationship" as what it says, and then it goes on

7  in the second sentence:  "The relationship is

8  based upon fair dealing and good faith."

9          Obviously, if you breach that implicit in

10  it's based upon fair dealing and good faith is

11  that you acted in bad faith.

12          But the way I read this, I can't tell

13  which of those are applicable, so for example,

14  unless the Jury believe that the trade secret was

15  acquired through a confidential relationship, it's

16  not necessarily true that then we'd have a bad

17  faith finding that I would need in order to apply

18  the exclusion. Do you agree with that --

19          MR. ROBERSON:  Well, I guess  --

20          THE COURT:  --  at least based upon this?

21          MR. ROBERSON:  I think for the bad faith

22  portion of it, I would probably agree, but to the

23  extent somebody misappropriates a trade secret,

24  that's willful misconduct.  Whether it's in bad

25  faith or not, it's willful.

1          THE COURT:  I hear you, but it would   --

2    I was surprised not to be able to quickly find a

3    decision in Texas that told me whether

4    misappropriation of a trade secret was an

5    intentional tort or not.

6          And, again, we didn't spend an enormous

7    amount of time looking, but nothing quickly popped

8    up.

9          MR. ROBERSON:  Your Honor, when I sit

10   down here in a moment and let Mr. Hail speak, I

11   will look at the Jury Charge which is the only

12   evidence I think we've got before us and see if

13   there's any other questions that assist us, but

14   I'm in agreement with you   --

15         THE COURT:  Well, the two I found were

16   the two that you've argued, this one and then the

17   Quanamero (phonetically spelled) defense.

18         MR. ROBERSON: Your Honor, again, I would

19   take us back to   --  go back to the

20   indemnification provision.

21         Your Honor, as I read this, the finding

22   of bad faith or willful misconduct finding would

23   bar recovery, assuming the indemnification sounded

24   in the first place (sic).  I don't it sounds in

25   the first place because its a claim by the

1   Indemnitee against the Indemnitor.

2           If there is a finding of bad faith or

3   willful misconduct, then I think it's just --

4   it's surplus because I don't think it really

5   matters here because I don't think it's a

6   two-party Indemnity Agreement.

7           Your Honor, let me proceed to a Chart

8   that we put together, Exhibit No. 13.  Recall back

9   to our Motion to Compel hearing, maybe too much of

10  a box drawer -- we tried to figure out how to get

11  all these claims in brackets so we could try them.

12          What this Chart does is it takes each

13  element of the Amended Proof of Claim and puts

14  them into a box and puts those boxes below the

15  Judgment, portion of the Final Judgment that I

16  believe they apply to.

17          So, let me give the Court an example.

18          In the lower left-hand corner of this

19  Exhibit, or this demonstrative, you see contract

20  damages of $776,000 with the red number 1 in

21  there.  They go to Slide 3.

22          THE COURT:  Right.  You've matched it up

23  to the Amended Proof of Claim?

24          MR. ROBERSON:  I have, Your Honor.

25          Let me go back to Slide 13, please.

1          Your Honor, so as not to drag the Court

2    through that exercise, you can see that I've

3    populated every box on this Exhibit with a number

4    that corresponds to the Amended Proof of Claim and

5    my interpretation directly from the language of

6    the Amended Proof of Claim to the portion of the

7    Final Judgment it relates to.

8          Now, there are attorneys' fees that are

9    included in the Amended Proof of Claim that are

10   not expressly provided for in the Judgment.

11         I recall Mr. Spector's term which I liked

12   which is "subsumed within the Final Judgment."

13   The issue is what -- which portion of those

14   attorneys' fees are expressly provided for in the

15   Judgment are subsumed in the Judgment by

16   applicable documents res judicata under Rooker-

17   Feldman.

18         In the center of this Exhibit 13 you'll

19   see a box denominated "attorneys' fees" and it has

20   the Numbers 5, 17, 20 and 21.

21         THE COURT:  Right.

22         MR. ROBERSON:  Those numbers correspond

23   again to boxes within the Amended Proof of Claim.

24         Let me go to the next Exhibit where we

25   talk about just these attorneys' fees.

1        Before I do that, let me go back to the

2   prior Exhibit.

3        Your Honor, excluding these attorneys'

4   fees in the center box for a moment, as I've said,

5   I believe that Rooker-Feldman applies to the

6   relitigation of everything that was litigated in

7   State Court.  I believe that the theories that

8   we've discussed here, vis-a-vis indemnity equally

9   apply, and even under an indemnity theory,

10  everything that's included in the box, "Judgment

11  versus Dorado" and the boxes below it, and the box

12  "Judgment versus Impact, et al" and the boxes

13  below it, this Court has no choice but to refrain

14  from litigating.

15       Let's talk about the attorneys' fees for

16  a second.

17       THE COURT:  But it's not clear  --  well

18  --  it's not clear to me they want me to

19  relitigate those.  In fact, I don't think they do,

20  I just think they want me to recognize their claim

21  for those amounts here based upon the Judgment

22  entered by the State Court.

23       Now,  --

24       MR. ROBERSON:  I agree with you, but I

25  what I think I heard Mr. Spector say was, if the

1   Court of Appeals reverses, we still have the right

2   to come over here to seek indemnity.  I don't know

3   how you do that.  For example, Box No. 1 down

4   there which is "Contract Damages", once the Court

5   of Appeals has litigated that matter, I don't

6   think this Court can relitigate it under any

7   theory.

8         THE COURT:  Well, but I have even a more

9   practical problem which is, we're going to trial

10  probably a whole lot quicker than the State Court

11  Appellate Judge is going to give us a ruling --

12        MR. ROBERSON:  Yes, Your Honor, and I

13  heard  --

14        THE COURT:  --  because I'm not going to

15  wait to see what the State Court Judge does before

16  we go to trial here, and so there you go.  I mean,

17  I don't think we even come back to  --  I don't

18  know how I view what they're asking for, if that's

19  really what they're asking for because it is not

20  my intention to await State Court Judgment

21  becoming final in the sense that it has exhausted

22  all appeals so that Impact can say, "Well, we got

23  a buck 95 as contract damages, but we really think

24  the Judge goofed up, and so we want another 700 or

25  800,000 instead of the buck 95 under our indemnity

1    theory."

2        I am -- at least at the moment, I don't

3    know how I do that.

4        MR. ROBERSON:  Your Honor, I don't know

5    how you do that either, and I would overlay that

6    analysis you just made with the fact that this is

7    not the typical situation where the Debtor -- the

8    Judgment's taken against the Debtor and they file,

9    and the Judgment is effectively superceded because

10   of the Automatic Stay.

11       Here we put up $1.3 million of cash and

12   transferred 5 percent of the stock.

13       THE COURT:  No, which was my point

14   earlier as to: Why are you seeking indemnity when

15   you've got a Judgment that has been fully

16   superseded?  Good luck on appeal.  If you win, go

17   get paid.  That's why it got superseded.

18       MR. ROBERSON:  Right.  I agree, Your

19   Honor.

20       THE COURT:  Please.

21       MR. ROBERSON:  Thank you, Your Honor.

22   Let me go to the last slide.  On this slide, what

23   I attempt to do is take the four elements of

24   attorneys' fees that aren't expressly addressed in

25   the Final Judgment.

1          THE COURT:  All right.  So, the second

2   slide just takes the middle box from the prior

3   one?

4          MR. ROBERSON:  Yes, Your Honor, it does.

5          THE COURT:  All right.

6          MR. ROBERSON:  And if we could get our

7   whiz-bang to work, we would have shown it coming

8   out of there, but we couldn't, so we have a second

9   slide.

10          The second slide just takes the middle

11   box, the attorneys' fees box and breaks it down

12   into an analysis that I think the law directs us

13   to, and that is that you have to look at the

14   attorneys' fees that are discussed, referenced in

15   the four elements of their Proof of Claim in light

16   of when they were incurred and what did they

17   relate to.

18          So, let me start with No. 17.

19          No. 17 off of Exhibit No. 3.

20          THE COURT:  That's the postpetition fees

21   that they claim that they've incurred here in the

22   bankruptcy case?

23          MR. ROBERSON:  Correct, and as you'll see

24   there, they say, "It may be augmented for

25   collections costs."

1          Texas law says that if you want to
2    recover fees for the cost of appeal or the cost to
3    collect your Judgment, you're entitled to ask for
4    it --
5          THE COURT:  You ask for those at trial.
6          MR. ROBERSON:  -- you're entitled to ask
7    for it; if you don't ask for it, you don't get it.
8    If you do ask for it, you get whatever you're
9    awarded and that's all you get.
10         I don't know how Box No. 17 can be
11   anything other than an attempt to collect on the
12   claim, the Judgment in the Bankruptcy Court, so if
13   it's not covered by the Judgment, if they didn't
14   get that within their Judgment, I think they're
15   barred by Rooker-Feldman from coming to this Court
16   and asking this Court to relitigate whether
17   they're entitled to attorneys' fees for collection
18   on the underlying Judgment.
19         THE COURT:  So, Impact is just an
20   unsecured creditor in the case?
21         MR. ROBERSON:  It is an unsecured
22   creditor in the case with whatever you call the
23   rights --
24         THE COURT:  Well, now with a superseded
25   --

1          MR. ROBERSON:  With a superseded

2   Judgment, and 800,000 earmarked pending the

3   outcome of this litigation.

4          THE COURT:  Well, but they don't have

5   lien in the 800,000.

6          MR. ROBERSON:  No.

7          THE COURT:  I mean, that was just posted

8   as security to ensure that their claim could be

9   paid if it were allowed.

10          MR. ROBERSON:  Yes, pursuant to the

11   Court's Order.  So, again, if it's collection, and

12   I can't imagine what else it would be in a

13   bankruptcy proceeding, Texas law tells us you

14   needed to get it in your Judgment.  If you did,

15   great; if you didn't  --

16          THE COURT:  But how could they get it in

17   their Judgment?  They didn't know you were going

18   to file bankruptcy.

19          MR. ROBERSON:  But no Judgment creditor

20   ever knows what efforts they're going to have to

21   go through to collect.  That's why the cases say,

22   "You can ask for it, and if you're awarded it, you

23   get it."  If you don't ask for it or you ask for

24   too little, the cases say, "You can't come back

25   and ask for more."

1          You get effectively one bite at the apple

2    under Texas law.

3          THE COURT:  And have you cited me case

4    law to that effect in your brief?

5          MR. ROBERSON:  Yes.

6          THE COURT:  All right.

7          MR. ROBERSON:  Your Honor, with respect

8    to Item 17 of the Amended Proof of Claim, we

9    believe that is barred by both Rooker-Feldman and

10   res judicata in its entirety because it's a

11   collection cost.

12          THE COURT:  I'm not sure what it is.

13          MR. ROBERSON:  Well, --

14          THE COURT:  I mean, I read what it says

15   on the Proof of Claim, that it was attorneys' fees

16   billed  --  are these the segregated  --  I recall

17   from a prior hearing Mr. Hail telling me that they

18   had to segregate their fees into recoverable which

19   is nonrecoverable in the underlying action.

20          MR. ROBERSON:  That's a mistake or

21   lawsuit.

22          THE COURT:  Right, right.

23          MR. ROBERSON:  This is solely post-Dorado

24   bankruptcy proceeding which would have been  --

25          THE COURT:  But 734?  No, no, no.

1    MR. ROBERSON:  No, Your Honor, we're in

2  No. 17. I'm going to get to 734 here in just a

3  moment.

4    THE COURT:  Okay.  Sorry.  No, 17, I

5  know.  That's the 30,000 of postpetition.

6    MR. ROBERSON:  Correct.

7    THE COURT:  Understand.

8    MR. ROBERSON:  I think that's collection

9  costs.

10    THE COURT:  I heard you on that.

11    MR. ROBERSON:  Okay.

12    THE COURT:  I'm sorry.

13    MR. ROBERSON:  That's all right.  Let me

14  move to 20 and 21, and then I'm going to wrap up

15  with 5.

16    THE COURT:  Okay.

17    MR. ROBERSON:  20 and 21, as the Court

18  saw earlier, are the claims of Mr. Heyn and

19  Mr. Calce.  And if we look at the Amended Proof of

20  Claim, the Chart that's before the Court, 20 and

21  21 owe about $36,000, and they assert here that

22  they're subject to indemnification which is a

23  slight change from their original Proof of Claim.

24    But let's go to Exhibit B which is part

25  of their Proof of Claim and see what they say in

1   their Proof of Claim about these fees.

2          The Court will look in the middle,

3   Mr. Heyn says that he submitted $21,354.28 of

4   those fees at trial.

5          If they've been submitted at trial, he

6   either got them or he didn't get them, and like

7   the collection costs we were just talking about,

8   or actually any attorneys' fees, you either get

9   them or you don't get them, and if you don't get

10  them from the Judge in the trial court, you're not

11  getting them from a subsequent proceeding such as

12  this proceeding.

13         So, I think for Mr. Heyn, his Proof of

14  Claim I believe is Item 20 or 21, I don't have

15  that before me, whichever   --

16         THE COURT:  His is 21.

17         MR. ROBERSON:  21, has to be reduced or

18  disallowed, except to the extent of the $6,776.30

19  that's not highlighted, and that is, and you can

20  see this is his exhibit, his words, not mine,

21  submitted at trial in Panola County since the end

22  of trial.

23         Clearly, what we'll have to do is we'll

24  have to take discovery on how the Panola County

25  portion and the since the end of trial portion

1   came about, and we'll do that when we come back

2   here in June, but as to the 21,354.28, I think

3   he's made it official that it's already been

4   submitted and it's part of the original Judgment,

5   or it's not part of the original Judgment, but if

6   it's not, he's barred by the applicable Texas law,

7   and that portion of his Proof of Claim should be

8   disallowed.

9          THE COURT:  And what is this from?

10         MR. ROBERSON:  This is Exhibit B to all

11  three of the Proofs of Claim filed by Impact, Heyn

12  and Mr. Calce.

13         THE COURT:  Okay.

14         MR. ROBERSON:  Your Honor, the same

15  argument with respect to Mr. Calce.  Bottom part

16  of the exhibit before the Court shows that

17  Mr. Calce submitted $5,000 at trial.  For the same

18  reasons that I just articulated with respect to

19  Mr. Heyn's Proof of Claim, I think that

20  Mr. Calce's Proof of Claim should be reduced by

21  $5,000 or disallowed, except to the extent of

22  $610.72 which we will try in June.

23         All right, Your Honor.  Let's go to

24  Number 5.

25         Item 5 is the category that was

1   originally A-5 that we talked about during the

2   original Status Conference.  As the Court can see,

3   there's $275,000 that was awarded as part of the

4   Final Judgment, and it's set forth in Item No. 3,

5   so we reduced the 734 by at least 275,000 because

6   it's part of the Final Judgment.

7          There's testimony  --

8          THE COURT:  So, you agree with me that

9   this 734 was the trial  --  that was the fees

10  incurred in litigating in the State Court action.

11  Is that what you understand that to be?

12         MR. ROBERSON:  That's what I understand

13  it to be.  I will honestly reply to the Court that

14  I have looked at the support for that, and it is

15  made up of all kinds of invoices, some of which I

16  can't tell what they are, but they are all legal

17  fees, legal fees and costs.  The overwhelming

18  majority of them appear to be related to the

19  trial.

20         THE COURT:  All right.  So, you think 275

21  is a clear duplicate?

22         MR. ROBERSON:  Clear  --  275's a clear

23  duplicate.  The testimony of Mr. Hail which was

24  attached to their Response, he's asked about what

25  fees his firm's incurred during the trial at the

1    end of the trial.  On his attorneys' fees portion,

2    he testifies 463,000 of fees have been incurred by

3    his firm, so I think you've got Plaintiff's

4    counsel admitting that at least 463 is a

5    duplicate, but Your Honor, I think it's broader

6    than that.

7           Let's go back to last line 14.

8           Your Honor, I think it really breaks down

9    to were the fees incurred before submission to the

10   Jury, and if they were incurred before submission

11   to the Jury, you either present them to the trial

12   court and get a Judgment on them, or you don't.

13          If you don't, Texas law tells us that you

14   can't seek recovery of those fees later from out

15   of the trial court or another court based on Texas

16   law in the concept of res judicata.  The Court

17   says you can get appellate fees, you can get

18   collection fees, you can get fees in the

19   underlying trial, but you get one bite at that

20   apple, and that's in the trial court, and you

21   can't come back later and relitigate that.

22          So, in my opinion, everything that was

23   incurred before submission to the Jury is buried

24   in Box 5 has to be disallowed.  The evidence that

25   we have which is an Exhibit B which I'll go back

1   to here in a moment.  In fact, let's go back there

2   right now.

3          Your Honor, this is the only evidence

4   that we have other than representation by counsel

5   at the hearing.  This indicates that in Panola

6   County, Impact  --  you see Impact on the top

7   line.  This is all of Impact's fees:  $734,000,

8   and then there's a subcategory Panola County costs

9   "included in above", and it totals about 52,000.

10          The evidence that we have before the

11   Court is that Panola County, the subpoena was

12   issued just prior to the commencement of the State

13   Court trial.  If we're --  in the abundance of

14   caution, if we assume everything in Panola County

15   happened after the trial, then we would carve that

16   out of the  --  of A-5 and try it in June.

17          We are not today seeking a Summary

18   Judgment on the portions of this exhibit that

19   relate to Panola County or are shown here to be

20   incurred since the end of trial.  I can't tell

21   when those were incurred.  I don't know whether

22   they implicate the Indemnity Agreement or not, but

23   giving them the benefit of the doubt, they could

24   have occurred after trial.

25          Everything that occurred before trial I

1   think is  -- I think they've got what they've got

2   and they don't get to relitigate it in front of

3   this Court.

4         Your Honor, there is a place that we cite

5   -- actually, we cite two cases.  One of them I

6   think is very instructive on the legal fees issue.

7   It's Super versus AGS.  It's a New York Court of

8   Appeals case.

9         There the claim that was sought was

10  solely attorneys' fees of the Indemnitee, and the

11  Court looked at the Indemnity Agreement and

12  concluded that the Indemnity for fees analysis was

13  just like the analysis for indemnity for damages;

14  that is, that is the Indemnity Agreement didn't

15  sound for a two-party indemnity claim for damages,

16  it didn't sound for a two-party indemnity claim

17  for fees.

18        I think the same legal theories apply

19  with respect to all of the attorneys' fees here.

20  If they are being sought for purposes of

21  indemnity, I think indemnity has been excluded for

22  the reasons I outlined a moment ago.

23        Your Honor, with respect to the cross-

24  motion --

25        THE COURT:  So,  -- let me ask you a

1    question before you move to the cross-motion.

2          So, from your perspective, if I'm  --

3    what do you believe, if I granted your Motion,

4    what's left at trial?

5          MR. ROBERSON:   Whatever fees were

6    incurred after submission to the Jury that relate

7    to the State and Federal investigations.

8          Let me explain the box that you're

9    looking at.

10          You can see that we have incurred after

11    submission, we have three boxes.

12          Appellate fees, it's clear that you can

13    have appellate fees after submission to the Jury.

14    I think that's self-evident, but again, I think

15    Texas law says those relate back to the trial and

16    you get whatever the Court awarded you, so if you

17    presented evidence that your appellate fees are

18    50,000 and you spent 500,000, that 450,000 is the

19    Complainant's problem.

20          Collection fees, for the reasons I just

21    said, I don't think they're recoverable.  The only

22    evidence we have of any fees that were not

23    incurred before submission are the State and

24    Federal investigation.

25          THE COURT:  So, the far right box is the

1   only thing that you think is left for trial if

2   your Motion is granted.

3           MR. ROBERSON:  Yes, Your Honor.  And,

4   again, Exhibit B gives us some indication of the

5   amount of those fees, somewhere on the order of 58

6   to $80,000.

7           Your Honor, briefly in response to the

8   Cross-Motion for Summary Judgment, I can either

9   argue that now or let Mr. Hail argue, however you

10  wish.

11          THE COURT:  Mr. Hail, do you have a

12  preference.

13          MR. HAIL:  I don't have any problem  --

14          THE COURT:  All right.  Please.

15          MR. ROBERSON:  Thank you, Mr. Hail.

16          Your Honor, with respect to the Cross-

17  Motion for Summary Judgment, I would point out

18  that there is no evidence of the reasonableness or

19  the necessity of any of the fees based on an

20  indemnity claim.

21          The Impact Group asserts on the one hand

22  that indemnity is a new separate distinct cause of

23  action while on the other hand says that their

24  proof of attorneys' fees on the old cause of

25  action are sufficient to prove up attorneys' fees

1    on the new.  I don't know how you can reconcile

2    those two.  I think you're seeking indemnity and

3    you're seeking attorneys' fees on the same

4    indemnity claim, I think you got to prove up the

5    reasonableness and necessity of those claims, and

6    there's no evidence of the reasonableness and

7    necessity of these fees.

8         There is evidence, as I indicated in the

9    form of Mr. Schmidt's Affidavit, that the fees

10    incurred with respect to Panola County in the

11    Federal Grand Jury Investigation do not belate

12    (sic) the services under the Agreement.

13         Thirdly, if some of the fees are subject

14    to indemnity, it's difficult to tell what they

15    are, whether they relate to Panola County or

16    submitted subsequent to trial, and that's why in

17    the abundance of caution, we've said "anything

18    incurred after submission."

19         Lastly, I would reiterate that the

20    indemnity provisions don't apply to causes of

21    action between the indemnity claimants, causes of

22    action between Dorado and the Indemnity claimants,

23    or to their legal fees.

24         For those reasons, Your Honor, I would

25    respectfully request the Court grant Dorado's

```
 1    Motion for Summary Judgment on the basis of
 2    Rooker-Feldman, res judicata, Texas law and
 3    disallow or refrain from relitigating all of the
 4    counts of the Amended Proof of Claim, 1 through
 5    21, except for the small portions of 20 and 21
 6    which I discussed a moment ago and those fees
 7    related to the State and Federal Investigation
 8    which are included in Item No. 5.
 9              THE COURT:  Very well.
10              MR. ROBERSON:  Thank you, Your Honor.
11              THE COURT:  Thank you.  Why don't we take
12    a five-minute recess and then we'll come back and
13    hear a response.
14                     (SHORT RECESS)
15              COURT CLERK:  All rise.
16              THE COURT: Be seated, please.  All right.
17    Mr. Hail.
18              MR. HAIL:  Yes, thank you, Your Honor.
19              THE COURT:  Please.
20              MR. HAIL:  Your Honor, I'm going to try
21    not to be duplicative of some of the background
22    information --
23              THE COURT:  All right.
24              MR. HAIL:  -- that counsel went into, but
25    I'm going to see if I can just rephrase it a
```

1    little bit differently.

2            THE COURT: Please.

3            MR. HAIL:  It's hard to follow sometimes

4    all of his buckets, so you know, I have different

5    buckets in my mind, we certainly think differently

6    in some ways.

7            There are really three categories that

8    we're going to be talking about here today, at

9    least I will.

10           We got the criminal investigation issue

11   that's the Panola County and the Justice

12   Department issue;

13           We've got the unrecovered State Court

14   fees, and essentially the -- you know, the

15   non-segregated breach of contract of fees that

16   were testified to at trial;

17           And then we've got the State Court

18   Judgment, the Dorado Judgment against Impact and

19   the Impact people.

20           As I understand  --

21           THE COURT:  The Dorado Judgment against

22   Impact.

23           MR. HAIL: Yes, yes.  Those are the three

24   primary things that I believe our respective

25   Motions deal with, and they certainly are broken

1    down into smaller subsets, but generally going to

2    be talking about it in those categories.

3            And they're moving for Summary Judgment

4    on Category B and C, the unrecovered State Court

5    fees, and then the Dorado Judgment.

6            THE COURT:  Oh, but they're also  --

7    they think you're asking for a fourth category,

8    and frankly, so do I based upon the colloquy at

9    the outset, and that is, you seek to be

10   indemnified for potential adverse outcome of an

11   appeal.

12           MR. HAIL:  After discussing that with my

13   co-counsel and upon a little more reflection,

14   again, in understanding that, it may appear we're

15   doing that.  I don't believe that's necessary

16   based upon certain of the Court's comments and

17   thinking through the fact it's superceded in that

18   type of issue, I'm certain the Court is not going

19   to go back and relitigate that issue.  So, there

20   is not a fourth category for purposes of this

21   Summary Judgment.

22           THE COURT:  All right.  So, you're in

23   agreement that there is no indemnity claim for

24   your Judgment against Dorado?

25           MR. HAIL:  Yes.

1      THE COURT:  So, you're going to look to

2   the appellate process and the supersedeas bond

3   with respect to satisfaction of whatever rights

4   you have against Dorado as reflected in the

5   Judgment?

6      MR. HAIL:  Yes, that's accurate.

7      THE COURT:  All right.

8      MR. HAIL:  Okay.  So, with that, I think

9   hopefully that frames it up just a little bit.

10      First of all, with regard to the scope of

11   the indemnification, that's certainly very

12   important, and you know, I don't have it on the

13   Screen, I never read it even though the Screen

14   need to get bigger and bigger as time goes on for

15   all of us, I can tell you.

16      THE COURT:  I just gave up and got

17   bifocals.  Now I can read just fine again.

18      MR. HAIL:  Well, I may need to borrow

19   those one of these days.

20      Anyway, what Your Honor clearly is going

21   to have to do is go back and carefully read the

22   Indemnification.  Like anything with

23   indemnification agreements, you read it four times

24   and the fifth time something else jumps out.

25      The big picture observations I would say

1    is 1, the scope of it is very broad just as far as

2    the scope of all possible avenues, including what

3    we believe are not only third-party claims but

4    claims directly between the parties.

5            THE COURT:  Do you agree, though, that

6    the general rule in Texas is that indemnity

7    provisions normally don't apply between the

8    parties to the indemnity, they generally are

9    designed to protect against third-party claims,

10   and at least Mr. Roberson has correctly cited a

11   number of decisions that characterize that as the

12   general rule, and that if you intend to protect

13   --  if the Indemnitor intends to protect the

14   Indemnity from claims against those two parties,

15   the Agreement should expressly state that?

16           MR. HAIL:  I certainly agree with the

17   general proposition of, you know, we certainly

18   have cited case law and there's numerous case law

19   that that's not the exclusive situation, the

20   Court's going to have to assert  -- again, sorry,

21   my Blackberry's off but I can't turn my wireless

22   off for it.

23           THE COURT:  Okay.  Fair enough.

24           MR. HAIL:  Seems to interfere with the

25   system.  So, generally, what the Court's certainly

1    is going to have to do is to carefully review the

2    language of indemnity, the scope of it, breadth of

3    it and see if it feels like it is broad enough to

4    include it.

5         With regard to the fact that there is a

6    reference to notice and defense in those types of

7    deals, we would just say, certainly  --  it's

8    certainly contemplated --  there's no question I

9    believe it would apply to third-party claims as a

10    general concept  --

11         THE COURT:  Right.

12         MR. HAIL:  -- and it strikes me that just

13    because there is a mechanism when dealing with

14    third-party claims like notice and those types of

15    deals, that would not be exclusive whatsoever of

16    the broad scope of picking up as an issue between

17    Dorado and Impact or Dorado and Calce or something

18    like that.  Obviously, if it's a third-party

19    claim, Dorado's not going to be aware of it any

20    sort of way unless they are  --  or they argue in

21    notice and maybe have some rights to protect

22    themselves and step in --

23         THE COURT:  But under what circumstance

24    --  I mean, help me understand because why would

25    Impact need an indemnity for claims arising out of