1   the Engagement Letter because, frankly, if it

2   doesn't get paid, it will do what it did, it will

3   sue for breach of contract and get a Judgment --

4          MR. HAIL:  I can tell you  --

5          THE COURT:  -- so, there doesn't seem to

6   me to be --  when I look at what the defined scope

7   is, or essentially arising out of the Engagement

8   Letter, I can understand why you need indemnity

9   from third parties, i.e., you're going to be

10  presenting as an investment banker -- Impact's

11  going to be presenting financial information to

12  third parties provided by Dorado.  If that

13  information proves to be false and you get sued by

14  somebody for misrepresentation, other things, you

15  need the protection from Dorado because you're

16  relying upon the accuracy of information they're

17  giving you to peddle it to a third party, but as

18  between the two of you, your rights are just

19  contract rights, and if Dorado breaches, you'll

20  sue them, as you did.

21         MR. HAIL:  Well, to the extent if Dorado

22  doesn't pay a fee, for example, as they didn't

23  this case, and the Jury found they didn't, then

24  that is something that we would just do a normal

25  suit on, and then we would try to get a recovery

1    and then we'll deal with that on appeal.

2              THE COURT:  Right.

3              MR. HAIL:  The whole concept behind this

4    is we're out trying to raise money for a startup

5    company and we don't want to be out of pocket

6    anything for any reason at all unless we are doing

7    something bad, willful, negligence, willful

8    misconduct, bad faith.  If we're acting in a bad

9    way, then we shouldn't get recovery, whether it's

10   a third party, or you know, a first-party claim.

11   That's the whole concept that is to provide very

12   broad protection to my clients who are not getting

13   paid anything, except I think there was a nominal

14   $1,000 fee at the very beginning.  They're not

15   getting paid anything on this deal unless over

16   some months or years they're able to successfully

17   raise some money.

18             THE COURT:  But that was their contract.

19             MR. HAIL:  Oh, sure, no, that's the

20   contract, but in the meantime, they don't want to

21   be out of pocket if there's any dispute with them

22   in Dorado or if there's any dispute with them and

23   a third party, they want full protection, and that

24   full protection is limited only by the language at

25   the end, if they engaged affirmatively in a

1    certain kind of level of conduct, and yes, they

2    should not get that type of protection.

3            So, I think that's the general reason why

4    it would pick up third-party and first-party

5    claims essentially.

6            THE COURT: Well, I mean, I know what the

7    concept is, but the struggle is:  Is this language

8    broad enough when at least the significant portion

9    of the indemnity clearly contemplates that the

10    parties were addressing third-party claims?

11            MR. HAIL:  Clearly, certainly the back

12    third, or you know, whatever it is, I don't know

13    how to characterize it, but it's clear the back

14    parties is addressing clearly the third-party

15    issue.

16            I think the first part of it, first

17    two-thirds or whatever the amount is, would

18    certainly go to the third parties as well as

19    claims between the claims between Dorado --

20    Impact or Dorado, or Calce or Dorado or Heyn or

21    any other agents or representatives, that type of

22    thing.

23            And, again, the Court's going to have to

24    read the language carefully, and I know you and I

25    could walk through it, but I think it would

1   probably be more effective for you to read

2   carefully yourself in your own time.

3          With regard to the criminal

4   investigation, just to clarify one thing, I don't

5   think Mr. Roberson misspoke but it may not have

6   been 100 percent clear.  We're not seeking

7   anything but a liability finding at this point.

8   We're not asking for a, you know, a sum certain

9   amount.  That's something that if the Court

10  certainly finds liability, we'll have to prove up.

11  There may be some discovery on the amounts so that

12  we can  -- but we would narrow it down, have a

13  much narrower claim.

14          THE COURT:  So,  -- well, for purposes of

15  Summary Judgment, you're just seeking the

16  liability?

17          MR. HAIL:  Exactly, as opposed to the

18  amount.  I realize the amount is something that's

19  going to have to be discovered out and dealt with

20  a little bit more carefully.

21          And perhaps if the Court does deal with

22  liability, sometimes that helps gets the parties

23  to just focus on the amount and maybe something

24  get worked out.

25          THE COURT:  How is the criminal

1   investigation covered by the indemnity that deals

2   with arising out of the investigation?

3           MR. HAIL:  Well, the -- sure, with

4   regard to the Department of Justice, just from the

5   face of the subpoena  --

6           THE COURT:  Do I have that?

7           MR. HAIL:  You do.  You do.  It's

8   attached to Mr. Schmidt's Affidavit.  We didn't

9   object to this portion, but there Item No. 2, says

10  "Produce all documentation containing

11  representations to investors by Don Schmidt, Tim

12  Wafford (phonetically spelled) and/or Dorado

13  Exploration, Inc., so the scope of the

14  investigation or the scope of the documentation

15  --

16          THE COURT:  I'm sorry.  I'm going to stop

17  you so I can -- it's helpful to me if I can find

18  it.  Where in your notebook, Mr. Roberson, would

19  Mr. Schmidt's Affidavit be?

20          MR. ROBERSON:  We've got an extra page.

21          THE COURT:  All right.  That'd be great

22  if you do.

23          MR. HAIL:  I was going to pull out the

24  Affidavit, that way  --

25          THE COURT:  Thank you, Mr. Hail.

1          MR. HAIL:  Yes, Your Honor, I believe

2     it's at the last tab.

3          THE COURT:  Wonderful.  Thank you.

4          MR. HAIL:  Thank you.  If you look over

5     at Tab 1-B  --

6          THE COURT:  All right.

7          MR. HAIL:  -- there's two things being

8     asked for here.  One is just by way of background,

9     Amelia Bowles (phonetically spelled) was the Don

10    Schmidt's and I guess Dorado in a more broad

11    sense, secretary for some period of time.

12         If you saw documents provided to you by

13    Amelia Bowles it's pretty certain she provided

14    certain Dorado corporate documents in that Donald

15    Schmidt, personal financial documents.

16         And then the second thing is produce all

17    documentation containing representations to

18    investors by Mr. Schmidt, Mr. Wafford and/or

19    Dorado Exploration, Inc., investigating potential

20    securities violations in connectin with monies

21    that were being raised contemporaneously with the

22    time that we are raising money -- "we" being

23    Dorado  -- excuse me  -- Impact is raising money

24    on behalf of Dorado.

25         Actually, what got this entire lawsuit

87

1  kick started was that the deal was about to close

2  out with Petrobridge (phonetically spelled) back

3  in August of '06  --  I believe August of '06.

4       We had concerns about potential

5  securities violations and reporting those.  There

6  was a lawsuit filed really focused primarily on

7  the issue of promise not to divulge confidential

8  information, don't talk to Petrobridge.  A hearing

9  was granted.  Then we came back in and filed the

10  Motion to Dissolve and had a temporary injunction

11  hearing.  And we certainly agreed not to divulge

12  anything confidential, but we got a carve-out for

13  -- or we were allowed to report potential

14  securities violations so we could fulfill our

15  duties under  --  what we felt were our duties

16  under various securities law.

17       And that's just by way of a little bit of

18  a backdrop, so there's been an issue, there had

19  been an issue lingering out there for quite some

20  time about the way Dorado had been raising money.

21       Obviously, if we're their financial

22  advisory service provider as it is in the

23  Engagement and we are contemporaneously raising

24  money while there is a Department of Justice

25  investigation into securities violations, it's a

1    pretty serious matter.

2           And so, that's how it would relate to

3    that.

4           THE COURT:  When were you first engaged?

5    The date of the Engagement Letter is  --

6           MR. HAIL:  When was Impact Equity first

7    engaged?

8           THE COURT:  Yes, sorry, you as  --

9           MR. HAIL:  I'd have to look that up.  I

10   want to say May of '05.

11          THE COURT:  April 18 of '05 is the date

12   of the letter.  And when --

13          MR. HAIL:  And to go back to one thing,

14   and we'll get to this issue more directly in a

15   moment.  You're basically asking were there two

16   agreements at issue here.  Yes.  There's what

17   everyone has called the Engagement Agreement.

18          THE COURT:  Yes.

19          MR. HAIL:  And then there was something

20   --  there was another agreement that has been

21   referred to generally throughout the cases, a

22   Confidentiality Agreement.

23          The direct parties on that, it's Piot

24   Capital (phonetically spelled) and Impact Equity,

25   and that Agreement was entered into basically the

1    initial meeting between Mr. Piot and Mr. Calce in

2    which --

3             THE COURT:  I don't know who Mr. Piot is.

4             MR. HAIL:  For purposes, it doesn't

5    really matter.  It was someone that Mr. Calce was

6    doing business with at some point back then.

7             And Mr. Schmidt had them sign a

8    Confidentiality  -- prior to providing certain

9    potentially proprietary Dorado documentation about

10   prospects and that type of deal.

11            THE COURT:  And when was  --

12            MR. HAIL:  So there's two different

13   contracts completely.

14            THE COURT:  And when was the

15   Confidentiality  --  that predates the engagement?

16            MR. HAIL:  The confidentiality that

17   Dorado prevailed on at trial court was the  --

18   I'm going to call the Piot Confidentiality

19   Agreement.

20            THE COURT:  And when was that entered

21   into?

22            MR. HAIL:  That was entered into

23   approximately a couple of months prior to the

24   Dorado Engagement essentially.

25            THE COURT:  Okay.

1          MR. HAIL:  I believe the idea was Piot,

2     Mr. Calce and Mr. Piot were not necessarily

3     interested in investing directly in Dorado, but

4     Mr. Calce was interested in seeing if he could

5     attempt to help raise funds for Dorado and it sits

6     on a contingent-type arrangement.

7          THE COURT:  All right.  And when from

8     your perspective did the Engagement conclude, if

9     ever?

10         MR. HAIL:  Well, that's a good question.

11    I haven't really thought about that.  Here  --

12    there's two aspects to the Engagement.  Well,

13    really, there's a primary term, and I don't recall

14    the precise number of months, I want to say six

15    months, but that would be an engagement.  There's

16    a primary term in which we are to identify funding

17    sources, that type of deal.

18         And then there's a tail provision which

19    goes on I believe for 18 months on really very

20    similar to trying to sell your house with Ebby

21    Halliday  --

22         THE COURT:  Right, so that if  --

23         MR. HAIL:  -- four or five buyers come

24    in, one of them comes along six months after that,

25    the engagement ends, you're still going to get

1    paid your deal.

2           THE COURT:  Your commission.

3           MR. HAIL:  A brand new person comes

4    along, probably not.

5           THE COURT:  All right.

6           MR. HAIL:  So, I guess really, it would

7    be, if I remember from the time frames correctly,

8    it would be two years from the date of engagement

9    which I believe you said was April 18.  So, that

10   would be the ending of any possible  --  and then

11   ·the  --  yeah, I think that would be right, so

12   about two years.

13          With regard to the Panola County issue

14   --

15          THE COURT: Okay.  So, just so I'm clear,

16   so by the time the Grand Jury subpoena that we've

17   just looked at is dated -- was issued December

18   14th, '07 --

19          MR. HAIL:  Yes, it was after  --

20          THE COURT:  -- So, in all likelihood, the

21   Agreement had lapsed by that point in time?

22          MR. HAIL:  Yes.  The Agreement  -- I

23   belive  -- I'd have to go back  --

24          THE COURT:  And I'm not holding you to

25   the 18th.

1          MR. HAIL:  I believe that would be right.

2     Yeah, the Agreement had lapsed, we were after the

3     trial, and various investors in Dorado which you

4     dealt with these people, had complaints and issues

5     with Dorado, and they were looking in  --  the

6     Justice Department was looking into potential

7     securities violations in that regard.

8          Obviously, it was the idea is, it was

9     looking back in the past  --

10          THE COURT:  Of course.

11          MR. HAIL:  -- back into the time period

12     during our Engagement, during the primary term.

13     We were continuing to work with Dorado far beyond

14     the primary term, and obviously, we believe it led

15     ultimately to the funding with the party issue for

16     the 25 million-dollar credit ceiling, but it was a

17     looking back during that period of time that

18     certain monies were being raised.

19          THE COURT:  And do you know  --  and if

20     you cannot tell me, that's fine, too.  Do you know

21     the status of this investigation?

22          MR. HAIL:  I do not.

23          THE COURT:  I take it your clients

24     participated  --  I mean, they responded to the

25     subpoena, and again, don't tell me anything you

1   aren't suppose to tell me, but I take it your

2   clients responded to the subpoena.

3         MR. HAIL:  We responded appropriately.

4   I'm not aware of any privilege from my dealings

5   with them, and need be, I'll get on the Stand and

6   we'll talk about my dealings with them, but we

7   appropriately responded to subpoena.  We have not

8   been subpoenaed for any further information, and

9   so I don't know --

10         THE COURT:  Fair enough.

11         MR. HAIL:  -- I don't where it's at

12   beyond that, I can't tell you anything further.

13         THE COURT:  All right.

14         MR. HAIL:  With regard, if you flip over

15   to Tab C, Tab C's Panola  --  actually, if you go

16   to Tab B, this is the Grand Jury Summons for

17   Panola County from Criminal District Attorney

18   Davidson.  It looks like it was issued  -- we were

19   subpoenaed to appear October 25th  -- "we" being

20   Mr. Calce and Mr. Heyn --

21         THE COURT:  Understood.

22         MR. HAIL:  -- October 25th, 2007 which

23   was about two weeks before trial, and what was

24   asked for in the subpoena, and this is extremely

25   broad, I could just paraphrase that.  Our entire

94

1   litigation file, I mean literally our entire file.

2   I believe we had about 20 boxes of documents. The

3   only thing that was carved out, I think I was able

4   to carve out attorneys' notes, or you know, a few

5   little direct attorney/client communication just

6   to make sure we didn't have any waiver of that,

7   and that was acceptable, but essentially 20 boxes

8   of documents were loaded up into an SUV and taken

9   down to Panola County for testimony.  Obviously,

10  precisely what is sent to the Grand Jury is

11  secret, and you know, you're not asking for that

12  --

13         THE COURT:  Of course.

14         MR. HAIL:  -- that and we can't get into

15  that, but what you can find from the record if you

16  flip on over Tab No. C, this is the warning to

17  Mr. Schmidt investigating for the offense of

18  conspiracy to commit theft of service, theft of

19  fiduciary funds, and theft.  In my general

20  understanding to put a little more meat on the

21  bones, Mr. --  there was concerns that even after

22  they knew Petrobridge was cutting off their

23  funding, Mr. Schmidt continued to make

24  representations, continued to do drilling

25  operations and that type of deal when there was no

1   money there and there wasn't going to be money

2   there.

3          The monies that were the way our clients

4   would relate to that, at least in part, is

5   obviously we put together  -- we were the

6   financial advisor, and we were the ones that put

7   together the Petrobridge deal, intimately involved

8   in it in knowledge of its details and the funding.

9   There was an initial tronch (sic) of funding --

10         MR. ROBERSON:  Your Honor, I hesitate to

11   rise to object, but we are so far outside the

12   evidence that's been presented by Mr. Hail in his

13   Response to our Motion.  I know the Court is

14   inquisitive of what's happened but we're now

15   talking about evidence that's absolutely not

16   before the Court, and I would object.

17         MR. HAIL:  I'm just trying to give you

18   some background from that standpoint.  I know

19   you'll take whatever is appropriate.  But anyway,

20   what is certainly in dispute we were certainly

21   involved intimately in raising the money and that

22   type of deal, and the funding conditions at

23   Petrobridge that would have to fund or what would

24   have to occur, not occur, certainly there were

25   certain conditions that went into effect for a

1   subsequent troches.

2        And, so, clearly, if Mr. Schmidt is

3   allegedly committing theft or breaching a

4   fiduciary duty or whatever else misrepresenting

5   the funding that's going to come in from

6   Petrobridge facility, that we were the one that

7   put together, I believe that directly relates to

8   the scope of our engagement, so that's just in a

9   nutshell in that regard.

10        THE COURT:  All right.

11        MR. HAIL:  With regard to  --  just a

12   couple of points with regard to the criminal

13   liability on it..  Clearly, there is no question,

14   And I don't believe Mr. Roberson even alluded to

15   that, there's no question that those two issues

16   were not dealt with at the trial, couldn't have

17   been dealt with at the trial, I mean the  --

18        THE COURT:  The criminal investigations.

19        MR. HAIL:   The criminal investigations.

20   The FBI or the Department of Justice issue came up

21   weeks after the trial was over.  The Panola County

22   issue came up just right on the Eve of trial,

23   certainly not something that we could have

24   properly presented to the Court in any way shape

25   or form.  We were well past any kind of argument

1   deadline to go forward in that regard, to do

2   discovery, to do that type of deal, so it's not

3   something that was dealt with before the Court, so

4   there's no res judicata issue, wouldn't be a

5   compulsory counterclaim or anything that would

6   limit it from that standpoint like some other

7   categories may very well.

8         In fact, and this is just for the record,

9   this is beyond the scope of the record, but if we

10  do go to trial, I'll have Motion in Limine where

11  Dorado specifically asked for exclusion of

12  mentioning the Panola County proceedings at the

13  trial and the Court granted it.  I mean, this went

14  --  and that was fine because, you know, the whole

15  idea, and I think in fairness to them, if we're

16  going, "Hey, they're bad guys, they're getting

17  investigated by a Grand Jury," that could taint

18  the Jury's decision, so I think the Court made an

19  appropriate decision in that regard.

20        With regard to the unrecoverable State

21  Court fees issue, as Your Honor knows from the

22  record, I believe I testified to total fees

23  incurred, and then I did under Bucca (phonetic

24  spelling) and other requirements, segregate it

25  down to just solely 38.01 breach of contract,

1   period, not defense of other issues or claims for

2   other nonrecoverable, just clearly segregated it

3   down to that.  And if I recall correctly, I

4   believe I testified as 375 and the Jury may have

5   cut it to 275, for whatever reason.  My opposing

6   comrade I think testified to 375 and they cut it

7   to a 100, so not exactly sure of the rhyme or

8   reason, but I was happy they cut mine less.  We're

9   not complaining about the dealt on that by any

10  means.

11          And I think we properly segregated out,

12  so we believe that is recoverable, and the

13  question then comes down to what you were talking

14  about Mr. Roberson is, is there a finding of bad

15  faith or willful misconduct.

16          THE COURT:  Well, but help me  --  I'm a

17  little confused by the numbers.  So, if we could

18  look at the attachments to your Proof of Claim.

19          MR. HAIL:  Yes.  Okay.  I believe, Your

20  Honor  --  my co-counsel's going to find it.  I

21  believe it would be the approximately 734 minus

22  the 275 is it.

23          THE COURT:  All right.  So, but let me

24  just so the record's clear, if you could get that

25  just so for all of us.

1    MR. HAIL:  It looks like it's  --

2    THE COURT:  If we walked through the

3  Attachment to your Amended Proof of Claim, you are

4  no longer seeking an allowance from this Court for

5  Items 1, 2, 3, 4  --  1, 2, 3 and 4.

6    MR. HAIL:  If I could have Mr. Spector

7  come up.  He put together this Chart, so I'm going

8  to double check.  You said 1 through 4?

9    THE COURT:  Correct.

10    MR. HAIL:  That is correct.  Okay.  All

11  right.  And what's your next questions then?

12    THE COURT:  And then, as I understand it,

13  the attorneys' fees you incurred during the State

14  Court litigation for which you would ask for

15  indemnity would be the 735,862.72 minus the 275

16  allowed by the Jury?

17    MR. HAIL:  Yes.  Yes, Your Honor.

18    THE COURT:  You also seek indemnity for

19  6, 7, 8, 9, 10, 11, 12 which are --

20    MR. HAIL:  That's the Dorado Judgment

21  against --

22    THE COURT:  Right, that's Dorado's

23  Judgment against Impact, et al.

24    MR. HAIL:  -- Impact, et al.

25    THE COURT:  13, you are withdrawing from

1  the Proof of Claim?

2        MR. HAIL:  Yes, for the same reasons as

3  Item 1 through 4.

4        THE COURT:  Correct.  And then 14 and 15

5  --

6        MR. HAIL:  Yes.

7        THE COURT:  -- are being withdrawn

8  because it's part of the State Court process and

9  you'll deal with that  --

10        MR. HAIL:  We'll deal with that in the

11  State Court level, yes, Your Honor.

12        THE COURT:  Now, Number 16, what is that?

13        MR. HAIL:  That would be  -- Number 16

14  would be the -- maybe let Mr. Spector.

15        MR. SPECTOR:  I believe that those are

16  the amounts that Impact sought but was not awarded

17  at trial.

18        THE COURT:  Are you seeking those here,

19  or not?

20        MR. SPECTOR:  those are subject to the

21  appeal.

22        MR. HAIL:  Based upon the reasoning that

23  we're listing this, no, for purposes of the

24  subject, we'll deal with that at the State Court

25  level.

1          THE COURT:  All right.  So, to recap: 1,

2     2, 3, 4, 13, 14, 15 and 16 are withdrawn from the

3     Proof of Claim being asserted here?

4          MR. HAIL:  Yes, Your Honor.

5          THE COURT:  And 5 is being amended to

6     reflect a credit of $275,000?

7          MR. HAIL: Yes, we did, we referenced,

8     subject to reductions, for amounts paid, but, yes.

9          THE COURT:  Okay.

10          MR. HAIL:  I mean, it references Item No.

11    3, yes, just put a number, Judge.

12          THE COURT:  All right.  12 is post-

13    judgment interest on the award the Debtor got

14    against Impact?

15          MR. HAIL:  Yes.

16          THE COURT:  17 is the postpetition I

17    assume cost of collection here?

18          MR. SPECTOR:  Correct, and that's the

19    cost of collection of the whole process.  You

20    know, it's attributable to cost of collection of

21    the Judgment, it's attributable to cost of

22    collection of fees that were owed in the Panola

23    County litigation.  There's no way that I can say

24    that, you know, I spent two-fifths of my time

25    working on the portion of this exhibit that

102

1   relates to the Judgment and three-fifths to Panola

2   County.  I wouldn't know how to do that.

3          THE COURT:  Well, you didn't keep time

4   that way.

5          MR. SPECTOR:  Correct.

6          THE COURT:  I mean, in theory, it could

7   have been allocated, but you chose not to?

8          MR. SPECTOR:  I really don't know how I

9   could have allocated it that precisely.  I mean,

10  trying to dissect  --  trying to  -- for example,

11  trying to segregate the fees from the Judgment as

12  opposed to Panola County, the bills, the process

13  of separating Panola County bills from non-Panola

14  County bills, I don't know whether you bill that

15  to Panola County or not.

16         THE COURT:  Well, but you could  --  I

17  mean, the time could be allocated.  It's like in

18  any bankruptcy case where you've got multiple

19  debtors and time is allocated from one to the

20  other based upon an estimate of  --

21         MR. SPECTOR:  But I don't know how you'd

22  allocate in that particular example because you're

23  separating two things.  Are you billing pro rata

24  based upon the amounts that you're separating, or

25  are you billing  --

1          THE COURT:  Well, but again, those are

2    certainly issues, but it can be done.  It's done

3    every day in bankruptcy court.

4          MR. SPECTOR:  Yeah, I think it would have

5    been much harder to quantify time on Panola County

6    costs or Panola County collections.  I mean, when

7    I was here arguing about confirmation, I didn't

8    argue that we were unimpaired with respect to the

9    Panola County Judgment.

10          THE COURT:  No, but it could be

11    allocated, Mr. Spector.  I mean --

12          MR. SPECTOR:  It could be allocated,

13    sure, and it could still be allocated that way

14    based upon dollar amounts I guess.

15          THE COURT:  Right.

16          MR. SPECTOR:  It just can't be allocated

17    in time blocks.

18          THE COURT:  Understood.  Understood.

19          MR. SPECTOR:  Yeah, that's all I'm

20    saying.

21          THE COURT:  Yeah.  And then postpetition

22    interest until paid, what is 18, and Mr. Spector,

23    you may need to stay up here.

24          MR. HAIL:  Yeah.

25          THE COURT:  Is on that your Judgment

1    against the Debtor?

2            MR. SPECTOR:  Yes, it's postpetition

3    interest.

4            THE COURT:  On Impact's Judgment against

5    the Debtor?  So, I take it that's withdrawn as

6    well, or not?

7            MR. SPECTOR:  No, because there could be

8    postpetition interest on the amounts that are

9    subject to indemnity for Panola County, even under

10   the Debtor's model, what remains.  Even if you

11   assume that the Debtor  --

12           THE COURT:  Well, but the portion  --

13   some amount of this presumably is postpetition

14   interest on the Judgment.

15           MR. SPECTOR:  Yes, some portion of it is

16   withdrawn, I agree.

17           THE COURT:  Okay.  So, a portion is

18   withdrawn on the Judgment?

19           MR. SPECTOR:  Yes.

20           THE COURT:  And the portion remaining

21   would be whatever amount of claim is allowed to  --

22           MR. SPECTOR:  Go forward in this case.

23           THE COURT:  -- go forward in this case,

24   you want postpetition interest on that amount

25   since you were to be unimpaired under the Plan?

1      MR. SPECTOR:  That's correct, because

2  they've superceded postpetition interest  --  I

3  mean, the supersedeas bond has a calculation of

4  postpetition interest in it.

5      THE COURT:  Correct, for the Judgment.

6      MR. SPECTOR:  For the Judgment.

7      THE COURT:  And so, what's remaining of

8  18 here is postpetition interest on any allowed

9  claim in the bankruptcy case?

10     MR. SPECTOR:  Correct.

11     THE COURT:  And then 19 is withdrawn

12  presumably because the common stock has been

13  deposited, as I understand it?

14     MR. HAIL:  Now it has.  There was

15  shortage.  There was a shortage that we dealt with

16  at the trial court.

17     THE COURT:  All right, but at this point

18  --

19     MR. HALE:  At this point it appears that

20  yes, at this point it appears that they've

21  delivered requisite number of shares.

22     THE COURT:  All right.  So, 19 is no

23  longer an issue.  All right.  All right.  So, what

24  we're dealing with for purposes of the claim

25  objection process here, whether it be trial or

1    Summary Judgment is 5 to the extent of $475,000 or

2    whatever the math is, the Judgment amounts awarded

3    to Dorado against Impact, et al, postpetition fees

4    incurred in connection with this bankruptcy case

5    by the Impact claimants, postpetition interest on

6    any allowed claim in the bankruptcy case, and the

7    Panola County fees incurred by Mr. Heyn and Calce.

8         MR. HAIL:  Yes, and fees, the Panola

9    County and the Department of Justice, fees and

10   costs.  There was some substantial costs.

11        THE COURT:  Right.  20 and 21 says "this

12   amount may be augmented for collection costs."

13   Got it.

14        All right.  So, I think I'm clear now.

15   Mr. Roberson, is that helpful?

16        MR. ROBERSON:  It is helpful.  I have

17   some observations, though, Your Honor, I'd like to

18   make when Mr. Hail's done.

19        THE COURT:  All right. Let's -- while

20   we're talking about the criminal investigations

21   --

22        MR. HAIL:  Yes.

23        THE COURT:  -- help me understand why

24   Mr. Roberson's argument is not correct with

25   respect to claims 20 and 21 from the spreadsheet

1    to the extent that Exhibit B to the Proofs of

2    Claim said that those amounts were submitted at

3    trial?

4              MR. HAIL:  The Panola and the -- well,

5    first of all, on the Department of Justice  --

6              THE COURT:  I'm not  -- I'm looking now

7    at your Proof of Claim, or Mr. Spector's exhibit,

8    spreadsheet that says, "$5,610.72 an 28,130.58,"

9    and then when I look at Exhibit B to the Proof of

10   Claim where those amounts are derived from it says

11   that 21,354.28 of the 28 and change was submitted

12   at trial and 5,000 of the 5610.72 was submitted at

13   trial.

14             MR. HAIL:  Yes, that would be right.

15   Those were  -- just so you know what they were  --

16   within the contract itself, not the indemnity,

17   there was a reimbursement of expense, I think it

18   was title expenses, but airline tickets, hotel

19   rooms, flying around trying to, you know, raise

20   money, those types of deals.  Those were

21   submitted, and there was a finding for those

22   issues, so there was finding  --

23             THE COURT:  There was a finding?

24             MR. HAIL:  There was a finding of $26,000

25   until we get to the  --  we get to the 776 by the

1   cash necessity of 750, add the 26,000 for the

2   reasonable out-of-pocket fees, expenses and costs

3   incurred in connection with performing our

4   activities.

5           THE COURT:  So, the 776 includes --

6           MR. HAIL:  It does include that 26, yes.

7           THE COURT:  Then the claim should be

8   reduced by that amount?

9           MR. HAIL:  Yes, it should based upon what

10  we've been talking about.

11          THE COURT:  Okay.  So, you agree that at

12  this point Item 20 should be $610.72  --  I need a

13  calculator.

14          MR. HAIL:  Your Honor, I'll --

15          THE COURT: Do you have a calculator?

16          MR. HAIL:  6,776.30 is the sum.

17          THE court:  That's what I get too.  So,

18  you agree that --  do you agree that the amount of

19  the claim that you're asserting under

20  Mr. Spector's cheat sheet Item 20 is $610.72, plus

21  costs, and 21 is 6,776.30 plus costs?

22          MR. HAIL:  I haven't run the math, but

23  that sounds approximately correct.

24          THE COURT:  All right.  And for purposes

25  of your cross-motion for Summary Judgment with

1   respect to the criminal investigation category,

2   you're seeking only a Summary Judgment that that

3   would be within the scope of the indemnity

4   provision and you would expect to prove up at

5   trial the amount?

6          MR. HAIL:  Yes, Your Honor.  May I

7   proceed?

8          THE COURT:  All right.  Please.

9          MR. HAIL:  Any other questions about the

10  criminal before we move off that?  You understand?

11         THE COURT:  I think I've got it.

12         MR. HAIL:  Any of the timing of

13  everything?

14         THE COURT:  I think I've got it.

15         MR. HAIL:  And I think we were  --  I was

16  just about to get to the unrecovered State Court

17  fee category.

18         THE COURT:  Please.

19         MR. HAIL:  One of the first issues is,

20  does it fall within this carve-out?  Is there an

21  affirmative finding of bad faith, willful

22  misconduct or gross negligence is the exact word,

23  and I believe the language has to be an actual

24  finding made by the Jury.

25         There's no dispute, no question at all,

110

1    you have the Jury Charge, there is no such

2    finding.

3            Now, what --

4            THE COURT: Well, it's arguably implicit

5    in a couple of findings.

6            MR. HAIL: It arguably could be implicit.

7    There's three different ways, and you're right,

8    we'll never know  --  I mean, I got my own idea

9    because sometimes it's actually a disadvantage to

10   be at the trial so I kind of know really what it

11   was.  It was really under the contract, but you

12   know, for purposes of the record, we don't know

13   which one of the three.  There's no way you could

14   say there was an affirmative finding of bad faith

15   when the Jury could have gone under any one of the

16   three, didn't have to find all three in order to

17   get to that, so there's no way  --

18           THE COURT:  I hear you.

19           MR. HAIL:  --  there's a disconnect

20   there.  Theoretically, there could be a

21   connection, but even with that, if you look at the

22   Chart, it's  --  all you're doing here  --  let me

23   see here.  That's question No.  --

24           THE COURT:  4, I think.

25           MR. HAIL:  Question No. 4.  What's being

1  asked is:  Did Dorado misappropriate  -- excuse me
2  -- Did anyone misappropriate Dorado's trade
3  secrets.  Item A, you have to show there is a
4  trade secret.  I don't think there's  --  that's
5  irrelevant for our purposes today.
6          On 2, it was acquired through the
7  confidential relationship.  That implicates that
8  good faith thing that we were looking down below.
9          THE COURT:  Correct.
10          MR. HALE:  So, that the Jury could find
11  any one of those three in order to meet Element
12  No. 2.
13          THE COURT:  I agree.
14          MR. HALE:  And then Item 3 is
15  unauthorized use of trade secret.  The  -- and I
16  believe -- we talked about and I believe we put in
17  the record the Texas Liability Act.  This was an
18  issue at post-trial because they were -- in order
19  to pave way for attorneys' fees, they were
20  attempting to argue under trial amendment for a
21  Texas Theft Liability finding, they were arguing
22  --  well, basically, the Jury's already found the
23  intentional conduct necessary for this, and the
24  Court denied  --
25          THE COURT:  Understood.

112

1      MR. HALE:  -- that because it did not

2   have the mental state required the intentional

3   tort was  --  this Jury's finding does not support

4   intentional tort finding, so the Court, among

5   other reasons --

6          THE COURT:  So, I take it you think

7   misappropriate  --  I'm sorry, I cut you off.

8          MR. HALE:  Misappropriation is not

9   misappropriation of trade secrets is not an

10   intentional tort, it does not have the requisite

11   mental state, for example, to support a Texas

12   Theft Liability Act.

13          THE COURT:  Well, it may not support that

14   one, but do you have case law that says that theft

15   --  misappropriation of trade secrets is not an

16   intentional tort?

17          MR. HALE:  I don't think I have it in

18   those terms.  We may need to look and see because

19   that's the term  --  that's the way you phrased it

20   and --

21          THE COURT:  Well, and I argue with me.

22   I'm just --  willful misconduct suggest to me that

23   we need an intentional tort.

24          MR. HAIL:  Well, the thing is you could

25   --  we just got to look at what the Jury --

1    clearly, if there was a finding of a, you know,

2    higher level mental state, there's no way that

3    wouldn't be --  you know, Item No. 4, not only is

4    it an unauthorized use but it's willfully done.

5         THE COURT:  Well, it is truly a question.

6    I don't know the answer to the question.

7         MR. HAIL:  Or it was done with some

8    degree of malice, or you know, intent to harm or

9    whatever it may be.  I don't believe  --

10        THE COURT:  So, what do you think

11   misappropriation of trade secret is?

12        MR. HALE:  I don't believe it has a

13   mental state.  I really honestly don't.  I said,

14   it's been a year and a half since we were really,

15   really digging into the case law on this because

16   there was a lot of argument about whether this was

17   appropriate or half crazy, but I don't believe it

18   has a mental state, and there's no  --  I don't

19   recall either one of us submitting a mental state

20   in the Charge.  I don't think we agreed to all the

21   terminology, even as a form issue, but I don't

22   believe it has the mental state.

23        THE COURT:  Okay.

24        MR. HALE:  So, with that, I don't believe

25   there would be any way, even setting aside the

1    Item No. 4B could be met by one of three ways, and

2    so we'll never know and so they can't argue that,

3    that I don't believe that there's mental state

4    because all you're doing to use the good faith

5    would be to establish the 4B1, but it's not

6    necessarily a finding that they acted in bad

7    faith.  It's just a relationship may have arose

8    because of the good faith and fair dealing between

9    the parties, but that doesn't mean it was

10   necessarily violated with a particular

11   unauthorized disclosure.

12        So, I think there's really two big

13   disconnects.  You're right, and you also raised

14   the unclean hands and clean hands was a defense,

15   was an equitable defense to a Quantum merit (sic)

16   there which I don't believe could even arguably

17   support this.  That's an affirmative finding of

18   bad faith or willful misconduct with regard to

19   this issue.

20        All right.  Then we come to the Dorado

21   Judgment, the $400,000 plus the attorneys' fees

22   and interest and that type of deal.

23        THE COURT:  Come back, though, to me, and

24   help me understand a little more detail about what

25   your unrecovered State Court fees are.  At least

1    what I think I understand is  --

2           MR. HAIL:  It would be --  a couple broad

3    categories.  One is the biggest one certainly

4    being -- it would be fees incurred on causes of

5    action for which recovery could not be had under

6    our breach of contract.  It would be nonbreach of

7    contract theories, and you know, defensive --

8    defense of affirmative claims being sought by

9    Dorado.

10          Now, as you know, sometimes there's a

11   little bit of an overlap.  I'm taking a deposition

12   of Mr. Schmidt, I'm asking a breach of contract,

13   I'm also trying to find some information on --

14          THE COURT:  The issue I just --

15          MR. HAIL:  I don't think you have to

16   segregate that out.  You're drafting a 40-page

17   Motion for Summary Judgment, 10 pages on breach of

18   contract, 30s on defending something.  Did I think

19   you've done others.  Say, no, you do need to make

20   some effort in that regard.

21          So, the first  -- the biggest tronch of

22   that would be those two aspects, fees spent on

23   pursuing causes of action upon which fees could

24   not be recovered under 38.01 and defended against

25   Dorado claims to the extent it would not overlap

1   with our breach of contract theory.

2          The second broad category, and as

3   Mr. Roberson, you know, had referenced, there are

4   other law firms at issue.   There were throughout

5   the course of this proceeding, although actually

6   from the very beginning with the Temporary

7   Restraining Order and Temporary Injunction and

8   throughout the course of the proceeding there were

9   concerns of securities issues, and you know, if we

10  ultimately get into that, we'll show you a whole

11  lot more detail, but there was legitimate reasons

12  for concerns of securities issues, and you know,

13  even before Panola and after the Department of

14  Justice came along.

15         Other securities lawyers, for example,

16  were looking into those issues, advising our

17  clients as to what their rights and obligations

18  were in those types of deals, and obviously,

19  that's something that could not be recovered.

20         So, in other words, really, all of it is

21  either me and my firm doing what we're doing or

22  some outside attorneys providing a particular area

23  of expertise or insight into things that are

24  directly to breach of contract issue for which we

25  sought recovery.

1        THE COURT:  But they were in connection

2   with the State Court trial?

3        MR. HAIL:  Oh, yes, they were all in

4   connection with the State Court trial.

5        THE COURT:  And how much of the 730  --

6   how much of Delta (sic) between 734 and 275 are

7   fees you affirmatively sought from the Jury that

8   were not awarded to you?

9        MR. HAIL:  I'd have to.  We had that in

10  the Summary Judgment record.  If I recall

11  correctly, I believe it was 100, 100,000.

12        THE COURT:  And where is that in the

13  Summary Judgment?

14        MR. HAIL:  That is attached to our

15  Response.  I could find that real quickly.

16        THE COURT:  All right.

17        MR. HAIL:  375.  I'm looking at Page 124,

18  125.  After segregating out the amount of time

19  incurred solely on unrecoverable claims, it's my

20  opinion that a reasonable and necessary attorneys'

21  fees incurred by Defendants in prosecution of the

22  claims, (can't hear what he's saying, he's away

23  from the microphone, probably at counsel table

24  with his head down reading off the paper).

25        THE COURT:  All right.  So, 100,000 was

1  affirmatively sought that was not awarded by the

2  Jury, for whatever reason?

3          MR. HAIL:  Yes.

4          THE COURT:  What is the basis upon which

5  I can give you that which the Jury didn't give

6  you?

7          MR. HAIL:  You can't.  We'll withdraw

8  that hundred.

9          THE COURT:  Okay.

10          MR. HAIL:  As I was --  literally, as I

11  mentioned about 30 minutes ago when I brought up

12  that Delta, that dawned on me, and I want to go

13  back and check that but I don't think that would

14  be appropriate.

15          THE COURT:  All right.  So,  --

16          MR. HAIL:  That may be in a sense a

17  Rooker-Feldman issue or something.  That may be

18  questioning or asking you to modify the State

19  Court Judgment.  We're not asking you to do that.

20          THE COURT:  All right.

21          MR. HAIL:  But we're not asking you to do

22  that right now.

23          THE COURT:  All right.  So, 734,862.72

24  minus 375, so what's left, if my math is correct,

25  is 359,862.72, and that is --  that amount are

1    fees that were incurred on the prosecution of

2    claims against Dorado for which attorney fees are

3    not recoverable under applicable nonbankruptcy law

4    under State law and fees of other firms with whom

5    you consulted and for whose fees you could not

6    seek to recover them under applicable state law.

7         MR. HAIL:  Yes, and No. 3, and defense of

8    certain claims brought by Dorado for which didn't

9    overlap appropriately enough with the breach of

10   contract claim that we didn't seek fees for that.

11        THE COURT:  Got it.

12        MR. HAIL:  I think that broadly picks it

13   up.

14        THE COURT:  All right.  I'm with you.

15        MR. HAIL:  Okay.  So now, I think we can

16   talk a little bit about the State Court Judgment.

17   We've already kind of touched base on this issue a

18   little bit with regard to the indemnification

19   language and notice provision, that type of deal,

20   so I don't think we need to revisit that anymore.

21        Let's talk a little bit about a couple of

22   the defensive, just broad defensive issues that

23   counsel has raised and give our take on that.

24        First of all, with regard to Rooker-

25   Feldman which Mr. Roberson brought up near the end

1    of his argument, and the Court obviously is

2    extremely familiar with that, I'm sure that Your

3    Honor is extremely with the Exxon case talking

4    about the limitations placed on it and perhaps how

5    it had been viewed a little bit too broadly.

6            We are not, and maybe it's clearer now,

7    and maybe this issue is mooted.  We are not

8    attempting to modify the State Court Judgment,

9    we're not claiming that --  we claim for purposes

10   of appeal that we believe the Court errored

11   respectfully on a couple of issues, but that's not

12   something that you're going to be touching or

13   dealing with in any way, shape or form, and so, I

14   said maybe with the clarifications that have been

15   raised, that's not an issue anymore.

16           Is it an issue?  If it's not an issue, I

17   can move on.  If it is an issue, I can talk about

18   it a little bit more.

19           THE COURT:  Well, let's  --  let me just

20   say kind of where it think we are on that.  What I

21   understand you now to be asserting is that you are

22   seeking a claim allowed here to essentially

23   indemnify you, to reimburse you for the Judgment

24   that was entered against the Impact Claimants by

25   the State Court?