1           MR. HAIL:  Yes.

2           THE COURT:  So, you're not asking me to

3    do anything with that Judgment other than to rule,

4    but under the indemnity, Dorado agreed to

5    indemnify you for that act  --

6           MR. HAIL:  Yes.

7           THE COURT:  -- for those damages?

8           MR. HAIL:  Yes, I believe that's

9    accurate.

10          THE COURT:  All right.  Then I get it.

11          MR. HAIL:  Okay.

12          THE COURT:  So that  -- so, essentially

13   deciding that issue just turns on whether or not

14   the indemnity provision is broad enough for Dorado

15   to have agreed to indemnify you from a claim it

16   successfully prosecuted against you?

17          MR. HAIL:  Yes.

18          THE COURT:  Okay.

19          MR. HAIL:  Okay.  All right.  Moving on

20   from Rooker-Fedlman the, talk a little bit about

21   res judicata which counsel dealt with for a little

22   bit.

23          First of all, let me  --  you know, we

24   had to take out  -- we have Impact.  We've been

25   broadly talking about the Impact entities or

1    Impact Group, and that's fine, but we need to make

2    clear there's Impact, there's Mr. Calce, there's

3    Mr. Heyn.  Mr. Calce, Mr. Heyn have personal

4    indemnification.  We've talked about that in

5    connection with the criminal proceedings, I just

6    want to make clear, there is no question that was

7    not something that was dealt with at trial in any

8    way, shape or form.  It would have been physically

9    impossible in the Department of Justice since it

10   happened afterwards, and even with regard to

11   Panola County which arose approximately two weeks

12   before the commencement of trial, there's no

13   conceivable way we could have raised that issue

14   and dealt with that issue.

15        You don't -- you find that out three or

16   four days before you do an opening argument that

17   there's something with Panola County we're suppose

18   to run down to the Court and ask to do a trial

19   amendment real quick and argue to the Jury.

20        And as I said, it wasn't a hundred

21   percent clear from Mr. Roberson's arguments

22   whether they're taking that far a position, but

23   with regard to Mr. Calce and Mr. Heyn, I don't

24   think there's any question and no argument -- it

25   wasn't raised by them, wasn't pled in any way,

1   shape or form, it couldn't have been those type of

2   issues, so I think in the Court's mind, hopefully

3   the Court will deal with that separately.

4           THE COURT:  Well, and at least,

5   Mr. Roberson, check this.  I don't understand you

6   to be arguing that the what I'll call the

7   deficiency, that the $610.72 plus costs and the

8   6776.30 plus costs are barred by res judicata?

9           MR. ROBERSON:  Your Honor, I'm not

10  arguing they are barred by res judicata, but

11  similarly, I'm not arguing that  -- I think at

12  this point we don't know what they are.  All we

13  can tell is that based on that page of their Proof

14  of Claim that they say they have fees and expenses

15  in that amount.  Whether they can prove that or

16  not  --

17          THE COURT:  I understand, but you're not

18  arguing that items  --  that the remaining

19  portions of Item 20 and 21 that you're entitled to

20  Summary Judgment based upon res judicata?

21          MR. ROBERSON:  Correct, I am not seeking

22  Summary Judgment on those amounts, nor to clear up

23  the point that Mr. Hail just raised, nor are we

24  seeking Summary Judgment today on any portion of

25  the amounts incurred by them in responding to

1    either the State or Federal subpoena.  We think

2    those numbers, as I indicated, but note one of our

3    moving papers is about $80,000.

4              THE COURT:  Right.  Okay.

5              MR. HAIL:  Okay.  Thank you.  This

6    exercise has been good today, to come down and

7    clarify some issues.  I'm glad we're doing this.

8    Appreciate Your Honor taking  -- actually, it's

9    going to be the entire afternoon it looks like.

10             So, let's go back to res judicata with

11   regard to Impact because that's certainly a sticky

12   or more complex issue.

13             At the outset I think the Court needs to

14   consider the jurisdictional aspect of what was

15   happening down at the State Court level.

16             The pleading speak for themselves.  I

17   think counsel properly presented what was in

18   various pleadings.

19             With one slight exception in a couple

20   situations where we referred it loosely to

21   indemnity, there was that fee provision that they

22   got recovery for.  There's a couple of times, some

23   things they flashed up, but not by any means being

24   misleading, but if the Court goes back and looks,

25   I think you'll see it was dealing more with

1    reimbursement of fees.  Probably could be a little

2    more careful in our language, but clearly we did

3    raise the broader scope of indemnity under Annex A

4    in various pleadings.

5           Contexturally, that came up a little bit

6    late in the case.  I would raise that issue, the

7    Court was not going to entertain it, and I know

8    there's no rulings in the record necessarily you

9    can go to or we would have cited to them.  The

10   Court wasn't going to entertain that.  Frankly, we

11   didn't worry about it a whole lot because we

12   didn't believe it really occurred until later.  We

13   were raising the issue a little as belt and

14   suspenders and then once it became obvious the

15   Court wasn't going to do anything, we left it at

16   that.

17          So, the question is:  At the time the

18   Court  --  any issue was submitted to the Jury or

19   the Court signed off on the Final Judgment, had

20   the claims accrued, if the claims had not accrued,

21   the Court does not have jurisdiction.

22          THE COURT:  Oh, but I disagree with you.

23   On Getty, Getty says differently, and that's Texas

24   Supreme Court.

25          You weren't obligated to assert your

1   indemnity claims, but at least as I read Getty,

2   and Mr. Roberson, as we've discussed earlier,

3   reads it even more broadly than I have so far, but

4   I think at a minimum, Getty says, "If you choose

5   to assert your indemnity claims, you gotta assert

6   them all."

7        And in Ingersol-Rand they expressly

8   reaffirmed Getty. They said, you know, "This case

9   is different than Getty, Getty is still good law."

10   And so, why isn't Getty dispositive on this issue?

11        It appears that you did raise the

12   indemnity issue, didn't have to but you chose to.

13   I completely agree with you that your indemnity

14   claim did not mature until there was judgment

15   entered against you, but you have the right

16   permissively to bring it ahead of time for

17   judicial economy, for whatever reason, and it

18   appears from the pleadings that you did that.

19        So, why aren't you barred by res judicata

20   from now demanding indemnity broader than what you

21   sought at trial because it appears that those

22   claims  --  I mean, you tell me that the State

23   Court Judge didn't really entertain them, but it

24   appears that he did.

25        MR. HAIL: Well, just to clarify a little

1  bit.  We had our pleading out there, and I believe

2  even right around that time  --  because there's a

3  Rule 11 in there.  I think Ms. Diaz was going to

4  go into some other issues or she had some new

5  damage models, and the Judge was "We're not going

6  to deal with that, you know, ladies and

7  gentlemen."  I mean, "We're just  --  that's not

8  going to be part of this, we got this case has

9  been going for trial, we're going forward."

10       And as said, we didn't feel like  --

11  weren't even sure when we brought those whether it

12  was appropriate to bring because they hadn't fully

13  -- they hadn't accrued yet, but we brought those,

14  and the pleadings are what they are, the Jury

15  Charge is what it is, I mean, are the --

16       THE COURT:  But why didn't you nonsuit

17  them?  If the Judge said, "We aren't going to

18  address these," then why didn't you say, then

19  "Time out, we need to nonsuit these so that we

20  aren't precluded later from bringing them?"

21       MR. HAIL:  Well, all I can say is we

22  didn't nonsuit it and we were not looking at it

23  from an issue of issue preclusion at a later

24  point.  I think they're accurate.  I mean, there's

25  nothing on the record certainly where it was

```
 1    nonsuited in a formal fashion.  I think that's

 2    accurate.

 3              THE COURT: Okay.

 4              MR. HAIL:  Anyway, that's response on the

 5    res judicata.

 6              THE COURT:  Well, but, so do you have any

 7    case law that says that you aren't bound --

 8              MR. HAIL:  You know, I got to tell you

 9    when you raised the Getty case, I haven't read

10    that case in awhile and every now and then  --  I

11    know all of us practitioners like to act like

12    every case is off the top of our head.  I haven't

13    read that case in awhile, and so, I'm at a little

14    bit of a loss just standing here, and I hate to

15    ever say that because usually I'm able to respond

16    about anything or at least try.  I'm not able to

17    better respond than I can at the moment.  We will

18    look a little bit more carefully honing in on that

19    and see if there is some case law that would more

20    directly address that issue and the argument that

21    I'm making, and if Your Honor would indulge us,

22    we'll look at that very quickly and get back

23    something to you, but beyond that, that's all I

24    can say here at the moment.

25              THE COURT: Fair enough.  Fair enough.
```

1        MR. HAIL:  Beyond that, I think that

2    generally addresses the points in the respective

3    motions, and I believe I generally responded to

4    Mr. Roberson without into unnecessary detail.  I

5    don't know if you may have a couple more comments.

6    Do you have any other questions or comments before

7    I sit down to understand any issue?

8        THE COURT:  I don't think so, Mr. Hail.

9    Thank you.

10       MR. HALE:  Okay.  Thank you, Your Honor.

11       THE COURT:  You've been very helpful.

12       MR. HALE:  Appreciate it.

13       THE COURT:  Mr. Roberson.

14       MR. ROBERSON:  Your Honor, I'll try to be

15    brief, and I appreciate the Court giving us the

16    afternoon.  I also appreciate the Court's efforts

17    to try to narrow this.

18       Here is what I think is remaining and my

19    observations on what's remaining.

20       17 remains to the extent of postpetition

21    fees.

22       THE COURT:  One second, let me get there.

23       MR. ROBERSON:  Sorry, Your Honor.

24       THE COURT:  Nope.  Yes.

25       MR. ROBERSON:  Postpetition fees related

1    to the indemnity issues and/or Panola County,

2    depending on how the Court rules here.  If it's an

3    indemnity issue, I think there are no postpetition

4    fees, and if it's a Panola County issue, there may

5    be fees.

6                The postpetition interest, again  --

7                THE COURT:  Well, except 17 is  -- part

8    of 17 is collection costs that you  --  that at

9    least I still  -- I understood you to be saying

10   were not recoverable because they weren't asked

11   for at trial.

12               MR. ROBERSON:  I think they're all

13   collection costs.  What I've heard the Court say

14   is that based on the representations of

15   Mr. Spector, that the Court will entertain or

16   appears to be willing to entertain an argument

17   that part of 17 and 18 are recoverable to the

18   extent there's an underlying basis to recover

19   either Panola County or indemnity.  Clearly, the

20   proof is in the pudding.  I have seen the bills

21   and I believe they can be allocated, but we won't

22   know how to allocate them until the Court decides

23   whether indemnity is completely out of the case.

24   Then the only thing left is Panola County.

25               THE COURT:  Okay, but I'm getting

1 confused again. So, help me. I did not

2 understand 17 to have anything to do with the

3 criminal investigations. I understood 17 to

4 solely be Mr. Spector's -- essentially,

5 Mr. Spector's fees incurred in connection with the

6 bankruptcy case.

7     MR. ROBERSON: I agree with that, but

8 what Mr. Spector said -- I'll try to paraphrase

9 him without butchering what he said.

10     I heard him say, "Judge, I can't break --

11 I can't allocate my $30,000, how much time I spent

12 preparing a Proof of Claim for Panola County."

13     THE COURT: Right.

14     MR. ROBERSON: -- "how much time I spent

15 on collection, how much time I spent on this or

16 that." So, I think there is a --

17     THE COURT: Yeah, but basically, this is

18 -- I mean, this is Mr. Spector's time in

19 representing the Impact Claimants in connection

20 with the bankruptcy case?

21     MR. ROBERSON: Yes, that's correct. I

22 agree with that.

23     And to the extent we can narrow it here

24 today, I think it's all collectin. They obviously

25 have an argument that part of it may relate to

132

1    Panola County or indemnity, and my observation is

2    to the extent that it relates to collection and it

3    relates to indemnity which I think, as I've said

4    several times, and will a couple more, indemnity's

5    out of the case, so it may be that we have to take

6    this entire 30,000-dollar amount and try all of it

7    and figure out what's what.

8         THE COURT:  Well, if -- well, if

9    indemnity is out of the case, is there a basis

10   upon which the postpetition fees are recoverable,

11   Mr. Spector?

12        MR. SPECTOR:  Your Honor, my

13   understanding of our basis for reimbursement of

14   the Panola County fees is indemnity, so at least

15   that indemnity claim is not out of the case.

16        THE COURT:  No, no, I understand, but put

17   --  don't talk Panola County yet.  But if  --

18   well, if I were to rule that the indemnity does

19   not cover claims between Dorado and Impact, what

20   is the theory for recovery of Item 7?

21        MR. SPECTOR:  If you were to rule that we

22   cannot be reimbursed for our participation in the

23   Panola County case, and I believe our basis for

24   reimbursement is our indemnity contract, then

25   there would be no basis for recovering my fees.

1          THE COURT:  Well, but I'm getting
2    confused because 30,000 -- some of the 30,000 is
3    Panola County.
4          MR. SPECTOR:  It's not Panola County in
5    the sense of "I didn't participate in Panola
6    County.
7          THE COURT:  Right.
8          MR. SPECTOR:  It's our claim, it's our --
9    it's my representation of a creditor whose claims
10   arise out of his indemnity obligation or out of
11   his indemnity rights with respect to losses he
12   incurred in connection with Panola County.
13         THE COURT:  Okay.  And I'm with you.
14         MR. SPECTOR:  Okay.
15         THE COURT:  So, to the extent or the
16   indemnity rights under the Judgment  --
17         MR. SPECTOR:  Yes.
18         THE COURT:  Both?
19         MR. SPECTOR:  Correct.
20         THE COURT:  So, I'm hearing you say, and
21   I'm just listening, check, that to the extent I
22   would rule that the indemnity is not broad enough
23   or is not specific enough to indemnify Impact from
24   -- let me say it the easier way.
25         If I were to rule that the indemnity

1   claim only applies to third-party claims, then

2   Item 17 goes away as does Items 20 and 21, yes?

3        MR. SPECTOR:   (No response.)

4        THE COURT:   I mean, frankly, I could make

5   it broader.

6        To the extent I rule that the indemnity

7   only applies to third-party claims, there is no

8   claim here, period.

9        MR. HAIL: Can I get some clarity at least

10   with respect to  --

11        THE COURT: Of course.

12        MR. HAIL:  If what you're saying is

13   there's just no indemnity, period, then there's no

14   basis for any claim here at all?

15        THE COURT:  Well, if I were to rule that

16   the indemnity indemnified you from claims made by

17   third parties against you.

18        MR. HAIL:  But not Dorado?

19        THE COURT:  But not from Dorado.

20        MR. HAIL:  Okay, that's  --

21        THE COURT:  What's left of this, if I

22   were to rule that the indemnity that's set forth

23   in Annex A is only from third party claims?

24        MR. HAIL:  Well, the  -- certainly the

25   Panola County, FB -- I guess the Department of

1   Justice, certainly two, those two broad

2   categories.  The --

3         THE COURT:  Okay.  So, --

4         MR. HAIL:  I think he heard your question

5   one way, I heard it another, we're trying to match

6   it up.

7               (Counsel confer)

8         MR. SPECTOR:  Mr. Hail used the Panola

9   County claims as claims by a third party that gave

10  rise to costs that we incurred that we need to be

11  indemnified of.

12        THE COURT:  Fair enough.  Fair enough.

13        MR. SPECTOR:  Okay.

14        THE COURT:  So that, to the extent that

15  some of your attorney fees, that some of you,

16  Howard Spector's attorneys' fees relate to the

17  protection of that claim, then you would still

18  assert that  --

19        MR. SPECTOR:  Correct.

20        THE COURT:  -- as a essentially part of

21  the third party claim process?

22        MR. SPECTOR:  Correct.

23        THE COURT:  Okay.  I'm with you.  Thank

24  you.

25        MR. ROBERSON:  Your Honor, so, again,

136

1  with respect to 17 and 18, in my view, they're

2  dependent upon how the Court ultimately rules on

3  whether indemnity beyond Panola County is

4  indicated, whether or not Panola County claims

5  themselves implicate indemnity agreement, whether

6  they're the third party or not, there are still

7  issues with whether those claims arise pursuant to

8  the services under the Agreement.

9          I heard the Court indicate that 20 is

10  limited to 610.72 and 21 is limited to 6776.30, am

11  I correct?

12          THE COURT:  Yes.

13          MR. ROBERSON:  All right.  Let me focus

14  on 5 for a minute.

15          5 is a bucket into which -- I keep using

16  that term and I use it intentionally, into which

17  the Impact claimants have poured all of their

18  attorneys' fees.

19          THE COURT:  Understand.

20          MR. ROBERSON:  Okay.  And pursuant to the

21  request that I made --

22          THE COURT:  All of their attorney fees in

23  connection with the State Court litigation?

24          MR. ROBERSON:  All of their attorneys'

25  fees.

1        THE COURT:  Well, not Mr. Spector's.

2        MR. ROBERSON:  Mr. Spector's are included

3    in there.

4        THE COURT:  You think the 734 includes

5    Mr. Spector?

6        MR. ROBERSON:  The documentary evidence

7    that I've been provided in support of Item No. 5

8    is all attorneys' fees, all costs, for example, it

9    has fees and expenses all the way through the last

10   couple of months, it has all of the appellate

11   fees, it has al the lawyer fees from Mr. Hail's

12   firm, the criminal firm that was brought in, its

13   got expense information that I can see directly

14   corresponds to a trial exhibit, and that has been

15   the conundrum that we've been trying to deal with

16   since Day 1, what  -- first of all, there's two

17   issues there.

18        THE COURT:  So, wait, wait.  So, instead

19   of  -- so, you think the 734 includes a $100,000

20   -- you think No. 5 includes 13 and 14?

21        MR. ROBERSON:  Your Honor, let me look at

22   13 and 14.

23        THE COURT:  That's the 150,000 awarded in

24   the Judgment for Impact's appeal.

25        MR. ROBERSON:  Yes, and let me explain

1    why I think that.

2         The Judgment awards appellate fees of 100

3    and 150.

4         THE COURT:   Correct.

5         MR. ROBERSON:   The 734 is the sum of

6    (away from mic).   There may be more than 150,000.

7    There may be less, but there are appellate fees in

8    the bundle that have been produced that are

9    clearly incurred after submission.   There are

10   collection fees in there that are incurred after

11   submission that clearly relate to the trial.   I

12   believe Texas law says, if you want those fees,

13   cited the case (can't hear) 68 and 69.   I think

14   the State law says, if you want those fees, you

15   better ask for them.   If you get them, you've got

16   them, and you can't get them   --   and my concern

17   here is that they have pled a generic number of

18   734,000, and said, "If you want the supporting

19   document, we'll give them to you."   I've asked for

20   them, I've gotten them.

21         If you'll recall, we had a Motion to

22   Compel which we have not yet completed, and that

23   dealt with whether redactions in those various

24   invoices needed to be unredacted so I could tell

25   what those fees were for, but I will represent to

1   the Court that there are numerous law firms in

2   there, many of them prior to the date of the trial

3   and many since.  And what I can read, it appears

4   to me to be trial fees and it appears to be

5   appellate fees and it appears to collection fees,

6   and while I can see state and federal

7   investigation fees in there, I agree with

8   Mr. Hail, I can't see how they could have brought

9   them in a trial given the time of the trial,

10  whether they are subject to (away from mic).

11        What Mr. Hail testified to at trial is

12  Exhibit Defendant's No. 13 was his firm incurred

13  463,000 fees at trial.  He testified that under

14  the Goda (phonetically spelled) case, he reduced

15  it by 88,000 because that was fees that weren't

16  recoverable, and when asked, he said those related

17  to Temporary Restraining Order hearings and a

18  couple of other hearings, I don't recall what they

19  were.

20        But what I'm telling the Court is, of

21  that 734,000, it is larger than 463,000.

22  Coincidentally, a portion --

23        THE COURT:  Oh, but he's already said

24  there were other firm fees in there.

25        MR. ROBERSON:  No question about it,

1   there's no questions about it, but they relate to

2   the trial.  Whether he asked the Court, asked the

3   Judge and the Jury at the trial court level to

4   award those fees or not is their problem.

5          Texas law says you ask for them or you

6   don't.  If you don't, you don't get them later.

7          So, if they  --

8          THE COURT:  Let me play devil's  --  I

9   mean, that seems a little unfair.  If Texas law

10   has a statutory predicate for the recovery of

11   fees, but if I were to disagree with you and find

12   that the indemnity was broad enough to cover

13   attorney fees, why shouldn't they be entitled to

14   recover the attorney fees  -- you're going to

15   argue  -- your answer to that is going to res

16   judicata because they didn't ask for them at

17   trial.

18          MR. ROBERSON:  Well, two  -- maybe three

19   answers.

20          One would be they're subject to

21   reasonable and necessity standards.

22          THE COURT:  Right, but  --

23          MR. ROBERSON:  Two, res judicata, and

24   three, they've got to be subject to -- they

25   themselves have to trigger the underlying

```
 1    indemnity agreement.  The Hooper case which I've
 2    referenced  --
 3              THE COURT:  I'm sorry.  I'm not following
 4    that.  They themselves have to trigger --
 5              MR. ROBERSON:  All right.  An Indemnity
 6    Agreement says, "I, the Indemnitor, indemnify you
 7    the Indemnitee from claims made by third parties
 8    for damages as a result of claims made by third
 9    parties.  And  --
10              THE COURT:  Well, let's assume I read it
11    broader than that.
12              MR. ROBERSON:  Okay.
13              THE COURT:  If I read it the way they want
14    me to read it, that you would read to indemnify
15    them for damages that they incurred in connection
16    with the Engagement Letter?
17              MR. ROBERSON:  Right.
18              THE COURT:  And they say, "We incurred
19    all of these legal fees and that's part of our
20    damages, and under Texas State law unfortunately
21    we could only recover two-fifths of them, but
22    there were still three-fifths more that we
23    reasonably incurred," I understand that we haven't
24    proven reasonableness yet, but they say that.
25              Why aren't they entitled to assert that
```

1    under their indemnity right?

2         MR. ROBERSON:   I think to the extent they

3    have indemnity right that sounds under this

4    Agreement, I think that they --  subject to

5    reasonableness and necessity, I think they would

6    have the right to recover, but the point I was

7    trying to make to the Court is, indemnity

8    agreements typically have two prongs.  You can be

9    indemnified for damages.  You can also be

10   indemnified for fees you incur defending yourself

11   against those damages.

12        The cases that look at the two-party,

13   three-party issue look at both, they look at

14   whether this is a two-party agreement on damages

15   for recovery of damages, on claims between the

16   indemnitor and the indemnitee.  And they also look

17   at recovery just attorneys' fees in a two-party

18   situation are recoverable, and they go through the

19   same analysis known as cooperation, et cetera.

20        So, to answer your question, Your Honor,

21   if they are entitled to indemnity and they can

22   prove that the fees were reasonable and necessary

23   and you decide that indemnity is implicated, then

24   I think they've got to prove them up, but my point

25   to you is that at the trial court, the testimony

1    from Mr. Hail was that he had incurred $463,000,

2    and what I'm indicating to you is that the

3    evidence that they have provided me in this bucket

4    of invoices includes not only Mr. Hail's fees, but

5    appellate fees, collection fees and other fees,

6    including fees related to state and federal

7    investigation.

8         They do not allocate them, and that's

9    what we talked about on the Status Conference on

10   the 17th of February, it's what I thought I had an

11   agreement to do prior to the Motion to Compel and

12   Status Conference on the 4th of March, and we are

13   sort of back to where we started.  We got a little

14   bit smaller Delta, but we do not have an

15   allocation of what goes into that 734,000.

16        If you determine that there is no

17   indemnity, no right to indemnity because it was

18   pled and overruled by the Mother Hubbard clause,

19   then I think the 734,000 number is zero. But maybe

20   it's less, it's slightly more than zero because of

21   the inclusion of the state and federal court

22   investigation.

23        My problem is and the problem that we're

24   going to have between now and trial is unless the

25   Court deals with the Motion  --  if we're going

1   forward, unless the Court deals with the Motion to

2   Compel so that we can see what these fees are for,

3   and compels some sort of allocation of these fees,

4   there's no way to tell what they are, they're just

5   a bucket of fees.

6           Let's assume there's --

7           THE COURT: Is the Motion to Compel set?

8           MR. ROBERSON: Not set.  It was carried

9   from a prior hearing.  We have a Motion to Strike

10  an Amended Proof of Claim on the 29th, and

11  depending upon how the Court decides today, we may

12  be asking the Court to reurge it, but my problem

13  is looking for a needle in a 359,000-dollar

14  haystack, and my representation to the Court is

15  that there are significant amounts of appellate

16  collection fees in there that relate to the State

17  Court trial.

18          So, we've got to figure out some way to

19  narrow this down.  I think that the way to narrow

20  it is that if indemnity is not indicated, the only

21  ability they've got to recover for fees, for the

22  fees and expenses associated with the state and

23  federal investigation.

24          THE COURT:  Well, and they've admitted

25  that.

1          MR. ROBERSON:  They've admitted that.

2          THE COURT:  I don't think there's any

3    dispute about that at this point.

4          MR. ROBERSON:  Correct, but to the extent

5    the Court finds that they may have an entitlement

6    to indemnity, we're going to have to unravel that

7    onion.

8          Your Honor, I'm advised by Mr. Mesches

9    that we can provide the Court evidence of this.

10   Neither Mr. Calce or Impact challenged the trade

11   secret liability finding on appeal.

12          I'm also advised that there's case law,

13   and I can't cite the case but I will in the

14   follow-up briefing give it to the Court that

15   equate a misappropriation to a conversion and

16   conversions are clearly an intentional tort, and I

17   will get that case law for the Court.

18          The other thing that I would point out to

19   the Court   --

20          THE COURT:  But you can have a negligent

21   conversion, it doesn't have to willful, I think,

22   if memory serves.

23          MR. ROBERSON:  I think you could.  I

24   think, though, the only way to square the Jury's

25   finding is that whatever happened, happened

1    intentionally.  It was either a breach of a

2    confidential relationship, it was breach of a

3    contract, or  --  I don't think you can read that

4    Jury question any other way.  I think you have to

5    give it the fairest reading you can.

6         The Court has asked the question about

7    intentional tort.  We'll give you that.

8         Next, Your Honor, I want to make sure the

9    Court understands that the Judgment that was taken

10   by Dorado against the Impact Group, there are four

11   parties to that, and that Judgment was several.

12        THE COURT:  Right, each one's 25 percent

13   liable.

14        MR. ROBERSON: Right.  Only three of those

15   parties are before the Court.  Blue Lion which was

16   one of the Judgment Defendants is not before this

17   Court, it is not a Claimant, so to the extent the

18   Court  --

19        THE COURT:  So, at most, they're entitled

20   to three-fourths of --

21        MR. ROBERSON:  Three=fourths of  -- you

22   go back to --

23        THE COURT:  -- the 400 plus, yeah, three-

24   fourths of whatever your Judgment was against

25   them, yeah, I'm with you.

1          MR. ROBERSON:  Correct, and all the

2   (can't hear, away from mic.)

3          Your Honor, Mr. Hail suggested that you

4   should proceed to enter a liability finding on

5   Panola County and federal investigation.

6          I would point out that we do have the

7   Affidavit of Mr. Schmidt.  It does indicate that

8   the investigations are unrelated to (can't hear)

9   under the Agreement.

10          I would note that his Affidavit indicates

11   that what they were doing raising money, observe

12   that that Agreement was long since terminated by

13   the time these investigations started.

14          THE COURT:  Well, but it  --  well, there

15   may not be evidence of this, but it makes sense

16   what Mr. Hail has told me that to the extent the

17   investigation is looking backwards, it could be

18   looking during the periods of time while the

19   engagement was still ongoing.

20          MR. ROBERSON:  It could be, and my point

21   to the Court is, I don't think at this point based

22   on this record you have evidence sufficient to

23   award a Judgment either way.  I think we're going

24   to have to go determine what happened in that

25   investigation.

1          Your Honor, that is all that I have to

2     say to the Court.  I would in terms of

3     housekeeping ask the Court to put the Motion to

4     Compel on the docket either earlier than the

5     Motion to Strike or at the hearing on the Motion

6     to Stike.

7          Secondly, I would ask the Court to

8     overrule the objections that were filed today at

9     noon to the Affidavit of Don Schmidt.

10         And then lastly, I'd like to get some

11    guidance from the Court on timing for post-

12    briefing after this hearing so that we're not --

13    we have a trial setting sometime in June, and we

14    need to move this thing along, so if there's going

15    to be post-trial briefing, I'd like the Court to

16    set up a schedule and we'll adhere to it.

17         THE COURT:  All right.  Thank you.

18         MR. ROBERSON:  Thank you, Your Honor.

19         THE COURT:  Mr. Hail?

20         MR. HAIL:  Yes, Your Honor.

21         THE COURT:  No. 5, does it include parts

22    ·of the 100 and $150,000?

23         MR. HAIL:  I don't believe so, I really

24    don't.  What may be slightly confusing is our

25    appellate counsel, Mr. Levinger, Hankinson

1    Levenger, maybe Carrington Coleman at the time he

2    was there, now Hankinson Levinger (phonetically

3    spelled), he was involved in some of the trial

4    process doing Jury Charge and some trial, but you

5    know, for parts I think appellate help.

6           I don't believe it does.  We are

7    certainly  --   I made a note to myself to go back

8    and do some double checking, but that's not the

9    intent, and I know that we will -- we'll take a

10   look into that.

11          THE COURT:  Well, do, and to the extent

12   that there is amounts that are --

13          MR. HAIL:  That would be in another

14   category, yes, we'll make that clear.

15          THE COURT:  All right.

16          MR. HAIL:  Yes, Your Honor.

17          THE COURT:  All right.

18          MR. HAIL:  And just a couple real brief

19   rebuttal points, a couple of things counsel

20   raised.

21          One, with regard to the nonappeal of the

22   misappropriation, all we  --  first of all, we're

23   appealing the heck out of the damages.  It's a

24   crazy damage theory, but that's neither here nor

25   there, but there was conflicting evidence in the

150

1  record about, I was given authority by Mr. Wafford

2  to send this over to this company and then

3  Ms. Wafford said no, I didn't.  The Jury found in

4  one way.  Obviously, there's legally sufficient

5  evidence to support that finding, so we're not

6  trying to disturb that.  By no way is that some

7  admission, you know, of that general concept.

8         The other thing is, said there's no way

9  -- have to talk about, you know, the only way to

10  square that finding is it's some sort of implicit

11  breach of a confidential relationship.  Well, a

12  breach of a confidential relationship is called

13  "breach of fiduciary duty."  It's a cause of

14  action in Texas.  And there's specific elements.

15  You can't -- if someone would be able to

16  extrapolate that into a breach of fiduciary

17  finding  --  imagine if we were trying to get a

18  trial amendment and go with that finding by the

19  Jury could support a breach of fiduciary duty,

20  there's no way that can happen.  And I said

21  there's a gap  --  there's two gaps, there's ABC

22  gap and then also that gap.

23         And then the final point of Mr. Schmidt's

24  Affidavit, you can read it, you can see how, I

25  don't conclusory and unsupported it is and

1    certainly make whatever rulings Your Honor deems

2    appropriate.

3           Another thing I'd point out --

4           THE COURT:  Well, what are your issues?

5           MR. HAIL:  One other thing  -- I think

6    you may have the only copy that I had admitted.

7    One other thing before I look at that maybe I

8    could raise.

9           If you think about the timing you were

10   asking, what's the term, the entire scope of our

11   engagement, and it's six months plus eighteen, so

12   two years.  We were engaged April '06.  That would

13   have  --

14          THE COURT:  '05, I thought.

15          MR. HAIL:  Was it '05?  Okay.  April '05

16   to all the way up to April '07, so anyway, you can

17   look at that with the timing of what the

18   investigations were.  And I know because Your

19   Honor dealt with a lot of these investors, I

20   believe all the securities have been sold prior to

21   that time.  I believe many of them were claimants

22   in the underlying bankruptcy proceeding.

23          But, anyway --

24          THE COURT:  Do you need  --

25          MR. HAIL:  You know, I may have one right

1    here, Your Honor.    Forgot I had another notebook

2    with me.    Okay.

3            Paragraph No. 5, we've got objections to

4    four of the paragraphs to the extent that certain

5    portions of them are legal conclusions and lack of

6    foundation.

7            You know, for example, I mean Impact

8    Group Services under the Agreement were limited in

9    their efforts to find funding.    I mean the

10    Agreement speaks for itself in that regard.    This

11    is an attempt to characterize that I think is

12    improper.

13            Looking at, you know, more fundamentally

14    I think for purposes of what we're talking about

15    here, if you, for example, to Paragraph No. 9

16    talking about going in front of the Grand Jury,

17    first of all, I mean I  --   I'm not sure he's not

18    getting dangerously close to violating the Grand

19    Jury confidentiality, but that's an issue I guess

20    I'm going to leave to him in that regard.

21            But to say the Grand Jury investigation

22    dealt only with outstanding invoices issued by

23    contractors is the reason why such invoices were

24    not paid, I'm not aware of the DA having to make

25    him aware of all the different issues that he's

1   investigating, his attempt to characterize what

2   the investigation was and limit the scope of it I

3   think is improper.

4          Then you get, for example, to Paragraph

5   No. 10.  Mr. Schmidt is attempting to state that

6   the Department of Justice was investigating his

7   Secretary taking some of his personal documents.

8   The Department of Justice is going to investigate

9   a Secretary taking a Texas boss financials and

10  personal information, and that's completely

11  undermined by Item No. 2 of the Department of

12  Justice subpoena asking for all documents

13  regarding his representations to investors.  Part

14  of what they were seeking was to the extent she

15  was taking actually stockholder records and other

16  type of information which was part of the bundle

17  of information she took and she provided over,

18  they wanted that as well.

19         But basically he makes it looks like  --

20  I'll call it the FBI and they went and got this

21  big investigation of my Secretary, taking some of

22  my documents.  That is a gross mischaracterization

23  of it, no foundation.  I can tell you from

24  personally dealing with the Department of Justice,

25  they're not real forthcoming about their scope of

1    their investigation.  You know, they don't really

2    share just a whole lot, they ask a lot more

3    questions than they answer.

4         I think you can just  --  and I know I'm

5    hitting this quickly because we're getting kind of

6    late in the day, and I think you can see that

7    basically the big problem we have with this

8    Affidavit is his attempt to narrow the scope or

9    you know, put the spotlight over here as to what

10   this related to and distinguish it from the

11   services that my client was provided I think are

12   improper and objectionable.  Obviously, if we go

13   to trial, we'll cross them and deal with those

14   issues, but for purposes of preserving the record

15   and our objections, I think those are issues that

16   we've raised.

17        We'd ask the Court to consider them as

18   the Court deems appropriate.

19        THE COURT: Thank you.  Response?

20        MR. ROBERSON:  Briefly, Your Honor.  I'll

21   reurge my objection that I made when we started.

22   It's late.  Had the objection been timely filed,

23   had an opportunity to amend the Affidavit to the

24   extent we thought it was necessary.

25        Secondly, with respect to Paragraph 5,

1    Mr. Hail has already argued that the scope of the

2    services was financial advisory which is very

3    broad.

4         As the President of DEI, I think

5    Mr. Schmidt can    --

6         THE COURT:  But can't I decide what the

7    scope was?

8         MR. ROBERSON:  Sure, but if the scope was

9    this big and they're financial advisory and all he

10   did was try to raise money, I think that's within

11   the purview of the President of the company to say

12   what they actually did, ad that's what they

13   actually did, they sought to raise money.

14        THE COURT:  Oh, but he characterizing

15   this under the Agreement, it was limited to.

16   Isn't that for me to decide what the scope of the

17   Agreement is?

18        MR. ROBERSON:  I agree, but I think

19   there's two parts to the question.  Does the

20   Agreement limit it, and if the Agreement doesn't

21   limit it, was the the actions actually taken?

22        THE COURT:  But that's not what he's

23   saying here, Mr. Roberson.  He's saying here that

24   Impact Group Services under the Agreement were

25   limited to.

1       MR. ROBERSON:  Again, Your Honor, maybe

2   if we had a timely objection, the Amendment would

3   have said, "The services provided under the

4   Agreement were limited."  The point is that they

5   did not provide financial advisory services.  You

6   heard Mr. Hail here argue that that's why they

7   were subpoenaed because they had shareholder

8   records.  I think what you're ultimately going to

9   hear is, their services ended six months after

10  they started.  They had a tail much like a real

11  estate broker, and they argued when the closing

12  occurred with an entity, they argued they had a

13  right to a fee, but I think what the evidence is

14  going to be, they didn't have anything to do with

15  the shareholders or anything else, so the point is

16  that what they actually did was less than what the

17  Agreement provided for.

18       With respect to his observations, what he

19  saw in the Grand Jury, those are his observations.

20  It's his impression based on the investigation as

21  it related to him.

22       THE COURT:  Well, but that's not what

23  this says either.  "The Grand Jury investigation

24  dealt only with outstanding invoices issued by

25  Panola County."  How would he possibly know what

1   the investigation dealt with or didn't deal with?

2          MR. ROBERSON:  Well, couple of reasons.

3   One --

4          THE COURT:  I mean, he may have an

5   opinion as to what it is, but he can't know.  I

6   mean, I can't imagine anybody told him exactly

7   what the investigation was all about.

8          MR. ROBERSON:  I'm not sure agree with

9   that, Your Honor. When the investigation is over,

10  the investigation is concluded, and to the extent

11  there was ever any confidentiality, vis-a-vis

12  Mr. Schmidt, I believe that confidentiality is

13  also gone.  The Court has heard in the main case

14  about the disputes in Panola County with the

15  contractors.  I think Mr. Schmidt can opine his

16  view of what happened in Panola County.  I think

17  that's what this does.

18          And lastly, with respect to Paragraph 10,

19  Amy Boyles was an employee, she took documents.  I

20  think the record in the trial court will indicate

21  that she gave those documents to Mr. Hail just

22  before the commencement of the trial and he

23  reported the theft of those documents to the FBI,

24  Social Security information, apparently had

25  shareholder information, obviously, securities

1    issues, and they commenced an investigation.

2              We can see from the subpoena which is

3    attached to his Affidavit in which Mr. Hail

4    referred to earlier that they were attempting to

5    get the records from Ms. Boyles that Ms. Boyles

6    took from Dorado's offices.

7              Again, I think all this does is raise an

8    issue of whether what was being investigated was

9    related to services provided under the Agreement,

10   and I think it puts it in issue.

11             THE COURT:  All right.  Fair enough.

12             MR. ROBERSON:  And we'd ask the Court to

13   overrule the Objection.

14             THE COURT:  The Court is going to

15   overrule the objection on timeliness grounds.

16   This should have been filed more than an hour and

17   fifteen minutes prior to the hearing on the

18   Summary Judgment because Mr. Roberson's correct,

19   that has prejudiced them from the standpoint of

20   not having the opportunity to attempt to reword an

21   Affidavit so that it might not be objectionable.

22   There was no excuse provided as to why this was

23   not filed in a timely fashion so that it could be

24   considered appropriately by the parties, so I will

25   overrule the objections for the simple reason that

1   they were filed too late to be meaningfully heard.

2        All right.  I am not prepared to announce

3   a ruling on the balance of the issues that remain,

4   but I do think today has been extremely helpful

5   because we have certainly narrowed the scope of

6   trial dramatically without even a ruling by the

7   Court on anything.  That's always the best.

8        So, in any event, I will attempt to issue

9   a decision very promptly because I know everyone

10  is hoping to go to trial in June, but I will also

11  warn you that I have several other matters that I

12  am working on and hoping to get detailed written

13  opinions out on soon.

14       But I would like  --  I may not write on

15  this, I may well just issue an oral ruling to try

16  and save time because I'm not sure there will

17  sufficient time given other commitments between

18  now and June to get a written opinion issued and

19  still be done meaningfully so that you can prepare

20  for trial.  So, I would like any remaining briefs

21  in very promptly.  So, what does anybody need?

22  The issue that I would like some help on frankly

23  is this intentional tort issue with respect to

24  theft of trade secrets, whether or not that is

25  going to fit within the exclusionary language of

1    the indemnification provision or not.

2         And then, Mr. Hail, you mentioned

3    something else that you wished to brief, and it's

4    escaping me right now.

5         MR. HAIL:  Res judicata and Getty, that

6    issue.

7         THE COURT:  So, how much time  --  when

8    can you get briefs in on those issues?

9         MR. ROBERSON:  Your Honor, on the

10   intentional tort issue, we can get it to you by

11   Friday, and I would like a couple of days after he

12   files whatever he's going to file, to respond.

13        THE COURT:  What about both of you filing

14   briefs by Friday, and if you want to reply by

15   Monday?

16        MR. HAIL:  The only thing I would ask,

17   I've got another case to clear my docket.  I've

18   got a significant only because it's my case I

19   guess, but I have a significant oral argument on

20   Tuesday morning at the Dallas Court of Appeals

21   that I had set aside my weekend to really get

22   ready for, so that would be just a little tight.

23   Could we have a couple days beyond that?

24        THE COURT:  To reply?

25        MR. HAIL:  To reply, yes, even until

1    Thursday morning would be great, least the end of

2    the day Wednesday so I can get focused.  I can put

3    a little bit of time into but I can get back after

4    it right when I get done with my argument.

5            THE COURT:  Fair enough.  If you would

6    get what I'll call your opening briefs in

7    addressing, Mr. Roberson, your -- well, both of

8    you will be addressing the intentional tort

9    question or whether the theft of trade secrets

10   fits within the exclusionary language of the

11   indemnity or not.  And to the extent you want to

12   argue about the Quantomero (phonetically spelled)

13   unclean hands, help yourself.  And then you'll

14   file your brief with respect to Getty Oil and

15   related issued.  That will all come in by 5

16   o'clock Friday.  And then let's say Thursday

17   morning at 10 for replies to each other's if you

18   feel the need to.  You don't have to reply, but if

19   you wish to, by 10 o'clock Thursday morning, and

20   then the Court will consider the matter under

21   submission.

22           MR. ROBERSON:  Very well.  Thank you,

23   Your Honor.

24           MR. HAIL:  Thank you.

25           THE COURT:  Good. You're excused.  I'm

1    going to be out here for a minute.

2

3

4

5

6                          CERTIFICATE

7            I certify that the foregoing is a correct

8    transcript from the electronic sound recording of

9    the proceedings in the above-entitled matter.

10

11

12

13    _____

14    Darla M. Chavez, Transcriber

15        Dated:_____

16    **Note:  Any spellings not available to

17    transcriber are indicated with (phonetically

18    spelled)

19

20

21

22

23

24

25